EXHIBIT "A"

# AGREEMENT FOR PEDIATRIC INTENSIVE CARE
# DEPARTMENT COVERAGE

THIS AGREEMENT FOR PEDIATRIC INTENSIVE CARE DEPARTMENT COVERAGE ("Agreement") is made and entered into as of the later of __1 2/1 2__, 2014, or the execution of the Agreement by both parties (the "Effective Date") between VHS San Antonio Partners, LLC a Delaware limited liability company, doing business as North Central Baptist Hospital ("Hospital") and Pediatric Inpatient Critical Care Services, P.A. ("Group") and shall commence on the __1__ day of __March__, 2014 (the "Commencement Date").

## R E C I T A L S:

A.      Hospital maintains a pediatric intensive care unit (the "Department") on the Hospital's premises to provide pediatric critical care services, as more fully described in this Agreement and Exhibit B ("Services"), and Hospital desires to assure physician coverage of such Services for the Department.

B.      Group employs or otherwise contracts with physicians duly licensed in the State of Texas ("State") and qualified as doctors of medicine with experience in furnishing Services (such physicians and "Director" (as defined in Section 2 below) collectively "Physicians"), and Group desires to provide Physicians for full-time coverage of the Department in accordance with this Agreement.

C.      Group and Hospital agree that it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an entity to be the exclusive provider of Services for the Department.

NOW, THEREFORE, for and in consideration of the recitals above and the mutual covenants and conditions contained herein, Hospital and Group agree as follows:

1.      **GROUP'S OBLIGATIONS.**

a.  **Services.** Hospital hereby engages Group on an exclusive basis for Group to provide to Hospital the Services and supervise the operation of the Department in accordance with Group's obligations hereunder. Group shall provide Physicians to provide such Services to Hospital and ensure that each Physician complies with all terms and conditions contained herein. More specifically, Group's Physicians shall: (1) be the exclusive providers of Services in the pediatric intensive care unit; (2) provide call coverage for the PICU, as defined in Exhibit B of this Agreement; (3) administer pediatric procedural sedation to Hospital inpatients and emergency room patients, as more fully described in Exhibit B; (4) respond to pediatric emergencies for both inpatient and patients in the emergency room of the Hospital, when requested by either the attending physician or the emergency room physician; (5) attend any and all meetings within the Hospital that Physicians are asked to attend by Hospital's Chief Executive Officer (the "CEO") except to the extent patient care responsibilities necessitates Physician's attention; and (6) perform such other duties as may from time to time be requested

1

VHS.000283

by Hospital, Hospital's Governing Board, Hospital's medical staff, and/or the CEO and agreed to by Group.

b. **Other Physicians.** The Services to be rendered hereunder shall be performed by Director and such other Physicians as may be employed by or under contract with Group. At all times while this Agreement is in effect, the CEO shall have the right to request removal of any such Physician if continued service by such Physician could jeopardize patient care or safety. Group hereby agrees to immediately remove any such Physician in accordance with Hospital's Medical Staff Bylaws.

c. **Physician Qualifications.** Each Physician who provides Services in the Department shall be duly licensed and qualified as a doctor of medicine to practice medicine in the State, shall be a participating physician in Medicare and in State's Medicaid program, and shall be approved for membership and/or clinical privileges on the medical staff of Hospital in accordance with Hospital's Medical Staff Bylaws and Rules and Regulations. Director and all Physicians shall be Board Certified in Pediatrics prior to performing the Services hereunder or, if not already certified, shall be Board eligible with requirements for Board certification as outlined by the American Board of Pediatrics with training completed. Group shall provide proof of such certification to Hospital upon Hospital's request.

d. **Records and Reports.** Group shall require the prompt submittal to Hospital's medical records administrator and/or the patient's private physician of written reports of all examinations, treatments and procedures performed pursuant to this Agreement. Group shall use the medical records and report forms provided by the Department and Hospital. Group agrees that all records and reports required by this Subsection shall be the exclusive personal property of Hospital but will be made available to Group for Group's billing and healthcare operations in accordance with Hospital's information security requirements.

e. **Representations and Warranties.** Group represents and warrants to Hospital as follows: (i) neither Group nor any Physician is bound by any agreement or arrangement which would preclude Group or any Physician from entering into, or from fully performing the Services; (ii) Physicians license to practice medicine in the State or in any other jurisdiction and Physicians Drug Enforcement Agency number have never been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or restricted in any way; (iii) Physicians medical staff privileges at any health care facility have never been denied, suspended, revoked, terminated, relinquished under threat of disciplinary action, or made subject to terms of probation or any other restriction; (iv) Group and each Physician shall perform the Services in accordance with: (1) all applicable federal, state, and local laws, rules and regulations; (2) all applicable standards of The Joint Commission ("Joint Commission") and any other relevant accrediting organizations, and (3) all applicable bylaws, rules, regulations, procedures, and policies of Hospital and its medical staff; (v) each Physician is a participating physician in Medicare and the State's Medicaid program; (vi) neither Group nor any Physician has knowingly in the past conducted, and is not presently conducting, its or his/her medical practice in such a manner as to cause Group or any Physician to be suspended, excluded, debarred or sanctioned under the Medicare or Medicaid Programs or by any government licensing agency, and has never been charged with or convicted of an offense related to health care, or listed by a federal agency as debarred, excluded or otherwise ineligible for federal

2

program participation; and (vii) except for those existing arrangements set forth on <u>Exhibit C</u>, Director will not provide directorship services to any other hospital during the term of this Agreement without Hospital's prior written consent, which consent shall not be unreasonably withheld. Group further represents to Hospital that the compensation paid or to be paid by Group to any physician is and will, at all times during the term of the Agreement, be fair market value for services actually provided by such physician, not taking into account the value or volume of referrals or other business generated by such physician for Hospital. Group represents to Hospital that Group has and will at all times maintain a written agreement with each physician receiving compensation from Group that is not an employee of Group (e.g., each non-employed independent contractor), which written agreement is or will be signed by the parties, and does or will specify the services covered by the arrangement. Group further represents that with respect to employees of Group with which Group does not have a written employment agreement, the employment arrangement is or will be for identifiable services and is or will be commercially reasonable even if no referrals are made to Group by the employee. Further, Group shall comply with all relevant claims submission and billing laws and regulations. Each of the representations and warranties set forth herein shall be continuing and in the event any such representation or warranty fails to remain true and accurate during the Term, Group shall immediately notify Hospital.

   f. **Medical Staff Membership.** Group expressly agrees : (i) the Medical Staff membership and/or clinical privileges, including any appointment and reappointment thereof, of Director and each Physician is based upon the Medical Staff Bylaws, and Group being the exclusive provider in the Department, and further the Medical Staff membership and/or clinical privileges of Director and each Physician at Hospital shall terminate in accordance with the Medical Staff Bylaws; (ii) the Medical Staff Bylaws shall control over this Agreement with respect to peer review matters of the Physicians; and (iii) Group shall cause each Physician who will provide Services under this Agreement to execute the Physician Agreement attached hereto as <u>Exhibit A</u> and incorporated herein by this reference.

   2. **DIRECTOR OF PEDIATRIC INTENSIVE CARE SERVICES.** Group shall appoint, subject to the prior approval of the CEO, a Physician or Physicians to serve as Director of the Department ("Director") while this Agreement is in effect. The duties as Director shall include: (i) participating in the educational programs conducted by Hospital and its medical staff in order to assure Hospital's overall compliance with accreditation and licensing requirements, and performing such other reasonable teaching functions as Hospital or Hospital may request; (ii) directing non-physician Department personnel in the performance of professional services for patients; (iii) advising Hospital with respect to the selection, retention and termination of all personnel who may be required for the proper operation of the Department; provided, however, that Hospital shall retain the ultimate decision-making authority regarding the selection, retention and termination of all such personnel; (iv) establishing schedules for all Services provided by Physicians in accordance with the terms of this Agreement; (v) supervising the development and implementation of Hospital quality assurance and quality improvement programs and procedures in the Department; (vi) assisting Hospital in the preparation and conduct of surveys by the Joint Commission and/or any other national, state or local agency; (vii) participating in Hospital's Medicare Performance Improvement ("MPI") initiatives and other performance management and innovation initiatives (such as Crimson a trademark program from The Advisory Board Company) as they pertain to increasing quality, efficiency and effectiveness of care delivered to

VHS.000285

patients; participation may include meetings, development and adoption of evidence based protocols and review of practitioner and group data; and (viii) performing any other duties that Hospital, Hospital's Governing Board, medical staff and/or the CEO may request and agreed to by Director.

3. **INDEPENDENT CONTRACTORS.** In performing the services herein specified, Group, and Physicians are acting as independent contractors, and shall not be considered employees or agents of Hospital.

4. **GROUP'S COMPENSATION.**

a. **Fee Schedules.** Group shall be compensated in accordance with <u>Exhibit C</u> attached hereto and incorporated herein by this reference.

b. **Incidental Use of Premises.** In addition to such other compensation as is provided under this Agreement in return for the services provided by Group as set forth in Sections 1 and 2, Group may utilize workspace used in performance of the Services (including, for example, desk, chair and IT access) in connection with the occasional, nonroutine performance of pediatric critical care services on behalf of other facilities. Group agrees that Hospital shall have no obligation to incur any incremental costs in providing such nonroutine access.

c. **Managed Care.** Group shall use its best efforts to participate in all third-party payment or managed care programs in which Hospital participates, render Services to patients covered by such programs, and accept the payment amounts as mutually agreed in accordance with such third-party payment or managed care programs.

5. **TERM.** The term of this Agreement ("Term") shall be three (3) year commencing on the Commencement Date. If the parties continue to abide by the terms and conditions of this Agreement without having executed a renewal or extension of this Agreement or advised the other party of such party's intent not to renew or extend this Agreement, then this Agreement shall automatically be extended on a month-to-month basis for up to six (6) months.

6. **TERMINATION.**

a. **Termination for Breach.** Except as otherwise stated in this Section 6.a, either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement, provided such breach continues for thirty (30) days after receipt by the breaching party of written notice of such breach from the non-breaching party. In the event of any non-payment of the Monthly Guaranteed Amount when due to Group under this Agreement and in addition to any other remedies Group may have, Group may immediately suspend Services under this Agreement without notice until such payment is received by Group, except to the extent such suspension would adversely affect the current Hospital patients who are in need of Services, in which case Group will continue to provide Services to meet such patient care needs.

4

VHS.000286

b. **Immediate Termination by Hospital.** Hospital may terminate this Agreement immediately by written notice to Group upon the occurrence of any of the following: (i) conduct by Group or any Physicians which could affect the quality of professional care provided to Hospital patients pursuant to the Medical Staff Bylaws, or be prejudicial or adverse to the best interest and welfare of Hospital or its patients; (ii) breach by Group or any Physicians of any of the confidentiality provisions hereof; (iii) failure by Group to maintain the insurance required under this Agreement; (iv) closure of Hospital, cessation of the patient care operations or sale of Hospital or of all, or substantially all, of Hospital's assets; or (v) Group's or any Physician's conviction of a criminal offense related to health care, or Group's or any Physician's listing by a federal agency as being debarred, excluded or otherwise ineligible for federal program participation.

Group may cure such breach caused by a Physician under this Subsection by immediately terminating all employment and other Group-based professional relationships with such Physician and preventing said Physician from providing any Services hereunder.

c. **Termination for Changes in Law.** In the event that any governmental or nongovernmental agency, or any court or administrative tribunal passes, issues or promulgates any new, or change to any existing, law, rule, regulation, standard, interpretation, order, decision or judgment (individually or collectively, "Legal Event"), which a party (the "Noticing Party") reasonably believes (i) materially and adversely affects either party's licensure, accreditation, certification, or ability to refer, to accept any referral, to present a bill or claim, or to receive payment or reimbursement from any governmental or non-governmental payor, or (ii) indicates a Legal Event with which the Noticing Party desires further compliance, then, in either event, the Noticing Party may give the other party thirty (30) days prior written notice of its intent to amend or terminate this Agreement. Notwithstanding the foregoing, the Noticing Party may propose an amendment to the Agreement to take into account the Legal Event, and, if accepted by the other party prior to the end of the thirty (30) day notice period, the Agreement shall be amended as of the date of such acceptance and if not amended shall automatically terminate.

d. **Effect of Termination.** As of the effective date of termination of this Agreement, neither party shall have any further rights nor obligations hereunder except: (1) as otherwise provided herein; (2) for rights and obligations accruing prior to such effective date of termination; and (3) arising as a result of any breach of this Agreement.

7. **INSURANCE.**

a. Group shall ensure, at all times during the Term, that all Physicians of Group, at Group's or Physicians' sole expense pursuant to their respective agreement, maintain professional liability insurance covering the Physicians who provide Services pursuant to this Agreement naming the Group as an additional insured, with an admitted carrier in the State of Texas and at the following limits:

Limits: $200,000 per claim/occurrence and $600,000 aggregate

Such insurance shall not be cancelable except upon thirty (30) days' prior written notice to Hospital. Such coverage shall be primary. Group shall annually provide Hospital certificates of

5

insurance evidencing such coverages and coverage extensions. This coverage shall be either (1) on an occurrence basis or (2) on a claims-made basis. If the coverage is on a claims-made basis, Group shall ensure that within thirty (30) days from the effective date of any termination of a Physician's employment or contractual relationship with the Group, such Physician shall purchase either a replacement policy annually thereafter having a retroactive date no later than the date the Physician began providing services for Group under this Agreement or unlimited tail coverage in the above stated amounts for all claims arising out of incidents occurring on and up to the effective date of termination of such Physician's participation under this Agreement and provide Hospital a certificate of insurance evidencing such coverage. Group hereby expressly acknowledges and agrees that the total premium costs for such tail coverage shall be borne by Group or Physicians pursuant to their respective agreement.

b.  Group's obligations under this Section 7 shall survive the expiration or other termination of this Agreement, regardless of the cause of any such termination.

8.  **ACCESS TO BOOKS AND RECORDS.** If the value or cost of services rendered to Hospital pursuant to this Agreement is $10,000 or more over a 12-month period, in accordance with section 1861(v)(1)(I) of the Social Security Act, Group agrees that for at least four years following the furnishing of such services, Group shall, upon written request, make available to the Secretary of the United States Department of Health and Human Services (the "Secretary"), the Comptroller General of the United States, or their respective duly-authorized representatives, such books, documents and records as may be necessary to certify the nature and extent of the cost of such services.

9.  **CONFIDENTIALITY.** Hospital, Group and Physicians agree to maintain, hold as confidential and not disclose the terms of this Agreement or any confidential or proprietary information that may be provided during the term of this Agreement to any other person (with the exception of their respective legal counsel, accountant or financial advisors), unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by the other party hereto. With respect to any patient or medical record information regarding Hospital patients, Group and Physicians shall comply with all federal and state laws and regulations, and all rules, regulations, and policies of Hospital and its medical staff, regarding the confidentiality of such information, including, without limitation, all applicable provisions and regulations of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

10.  **ARBITRATION.** Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by final and binding arbitration in San Antonio, Texas in accordance with the American Health Lawyers Association ("AHLA") Alternative Dispute Resolution Service Rules of Procedure for Arbitration ("Rules") before one arbitrator applying the laws of the State of Texas. The parties shall attempt to mutually select the arbitrator. In the event they are unable to mutually agree, the arbitrator shall be selected by the procedures prescribed by the AHLA Rules. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties.

VHS.000288

11.   **INDEMNIFICATION.** Both parties mutually agree to indemnify and hold each other harmless from and against all liability, losses, damages, claims, causes of action, cost or expenses (including reasonable attorneys' fees), which directly or indirectly arise from or is in any way connected with any and all acts or omissions in the performance of the obligations under this Agreement by the indemnifying party, its agents, servants, representatives and/or employees.

12.   **ENTIRE AGREEMENT; MODIFICATION; GOVERNING LAW; COUNTERPARTS; NOTICES; WAIVER; ASSIGNMENT.** This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the parties relating to such subject matter. This Agreement may not be amended or modified except by mutual written agreement. This Agreement shall be construed in accordance with the laws of the State, which provision shall survive the expiration or other termination of this Agreement. This Agreement may be executed in one or more counterparts, all of which together shall constitute only one Agreement. All notices hereunder shall be in writing, delivered personally, by certified or registered mail, return receipt requested, or by overnight courier, and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, or deposited with the overnight courier, addressed at the place identified on the signature page below. A waiver by either party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure. Group shall not assign or transfer, in whole or in part, this Agreement or any of Group's rights, duties or obligations under this Agreement without the prior written consent of Hospital, and any assignment or transfer by Group without such consent shall be null and void. This Agreement is not assignable by Hospital without consent of Group.

13.   **REFERRALS.** The parties acknowledge that none of the benefits granted Group or any Physician hereunder are conditioned on any requirement that Group or any Physician make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Hospital or its affiliates. The parties further acknowledge that no Physician is restricted from establishing staff privileges at, referring any patient to, or otherwise generating any business for, any other facility of Group-affiliated physician's choosing.

14.   **NON-DISCRIMINATION.** Group agrees to treat in a nondiscriminatory manner any and all patients receiving medical benefits or assistance under any federal health care program.

15.   **ASSISTANCE IN LITIGATION.** Group and each Physician shall provide information and testimony and otherwise assist Hospital in defending against litigation brought against Hospital, its directors, officers or employees based upon a claim of negligence, malpractice or any other cause of action, arising under this Agreement, except where Group or Physician is a named adverse party.

16.   **DISCLOSURE OF TERMS OF AGREEMENT.** Neither party shall disclose the existence of this Agreement or its terms to any third party by way of any press release, advertising, marketing, publicity or other media, without the prior written consent of the other party hereto. Neither party shall use the name, trade name, trademarks, service marks or logos of the other party or any of its affiliates in any press release, advertising, marketing, publicity or other materials, without the prior written consent of the other party. Neither party shall not

7

VHS.000289

represent, directly or indirectly, that any product or service it provides or performs has been approved or endorsed by the other party or any of its affiliates, without the prior written consent of such party.

17. **COMPLIANCE OBLIGATIONS.** Group and Physicians each represents that he/she/it read, understands, and shall abide by Tenet's Standards of Conduct. The parties to this Agreement shall comply with Tenet's Compliance Program and Tenet's policies and procedures related to the Deficit Reduction Act of 2005, Anti-Kickback Statute and the Stark Law. Tenet's Standards of Conduct, summary of Compliance Program, and policies and procedures, including a summary of the Federal False Claims Act and applicable state false claims laws (collectively "False Claims Laws") with descriptions of penalties and whistleblower protections pertaining to such laws, are available at: http://www.tenethealth.com/about/pages/ethicscompliance.aspx. Group shall require any employees providing services to Hospital to read the Standards of Conduct and information concerning Tenet's Compliance Program and abide by same. Further, the parties to this Agreement certify that they shall not violate the Anti-Kickback Statute and Stark Law, and shall abide by the Deficit Reduction Act of 2005, as applicable, in providing services to Hospital. Hardcopies of any information shall be made available upon request. Group, Physicians, and any employees, if applicable, shall complete any training required under Tenet's Compliance Program.

18. **EXCLUSION LISTS SCREENING.** Group shall screen all of its current and prospective owners, legal entities, officers, directors, employees, contractors, and agents ("Screened Persons") against (a) the United States Department of Health and Human Services/Office of Inspector General List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov), (b) the General Services Administration's System for Award Management (available through the Internet at http://www.sam.gov); and (c) any applicable state healthcare exclusion list (collectively, the "Exclusion Lists") to ensure that none of the Screened Persons are currently excluded, debarred, suspended, or otherwise ineligible to participate in Federal healthcare programs or in Federal procurement or nonprocurement programs, or have been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but have not yet been excluded, debarred, suspended, or otherwise declared ineligible (each, an "Ineligible Person"). If, at any time during the term of this Agreement any Screened Person becomes an Ineligible Person or proposed to be an Ineligible Person, Group shall immediately notify Hospital of the same. Screened Persons shall not include any employee, contractor or agent who is not providing services under this Agreement.

19. **NON-SOLICITATION.** Except with the written consent of Group or Hospital, as applicable, the parties agree that for a period of one (1) year following any termination of this Agreement, neither party shall, directly or indirectly, (i) contact, hire, contract with, or otherwise take away, or cause to be hired, contracted, or taken away any employees or independent contractors of the other party hereto; or (ii) solicit, or encourage any employee or independent contractor to terminate employment or contractual relationship with or cease providing services to or for the other party or in any way interfere with the relationship between the other party and its employees or independent contractors.

20. **SURVIVAL.** The provisions of Sections 4(a), 7, 8, 9, 10, 11, 15, 18, and 19 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

VHS.000290

**VHS SAN ANTONIO PARTNERS, LLC**
**d/b/a North Central Baptist Hospital**

By: _Bill Waechter_
Name: _Bill Waechter_
Title: _President_
Date: _12/12/14_
Address: _520 madison oak_
_San Antonio, TX 78258_

**PEDIATRIC INPATIENT CRITICAL CARE**
**SERVICES, P.A.**

By: _Thomas Gowanski MD_
Name: _Thomas Gowanski_
Title: _Director_
Date: _12/12/14_
Address: _19223 Stone Haven_
_(210) 491-0772_

9

# EXHIBIT A

## PHYSICIAN AGREEMENT

I, _____, am a member, associate, partner or employee of or an independent contractor under contract with **Pediatrics Inpatient Critical Care Services, P.A.** ("Group"). I understand that I am bound by all terms and conditions of the Agreement for Department coverage dated _____, 201___ (the "Agreement") between **VHS San Antonio Partners, LLC dba North Central Baptist Hospital** ("Hospital") and Group. In consideration of my approval by Hospital to provide services at North Central Baptist Hospital ("Hospital"), pursuant to the Agreement, I knowingly and voluntarily agree to the following.

I understand, acknowledge and expressly agree that it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an entity to be the exclusive provider of the Services for the Department. I further understand, acknowledge and agree that upon the expiration or earlier termination of the Agreement, with or without cause, Hospital shall have the right to grant an exclusive contract for the provision of Services to any person or entity.

I understand, acknowledge and agree that the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges. I understand, acknowledge and agree that unless and until such loss of membership occurs, I am bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff.

Without limiting the foregoing in any way, I understand, acknowledge and agree that if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision of Services to any person or entity.

I agree that if any one or more of the provisions contained herein shall be held to be invalid, illegal or unenforceable for any reason, whether in whole or in part, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Physician Agreement shall be construed as if such provision had never been contained herein.

BY MY SIGNATURE BELOW, I ACKNOWLEDGE THAT I HAVE CAREFULLY READ AND UNDERSTOOD THE ABOVE PHYSICIAN AGREEMENT, AND I HAVE CAREFULLY READ AND UNDERSTOOD THE AGREEMENT REFERRED TO ABOVE AND THAT I KNOWINGLY AND VOLUNTARILY AGREE TO THEIR TERMS.


Date:_____

By: _____

VHS.000292

## EXHIBIT B

## SERVICES

**Pediatric Intensive Care Unit (PICU):** In order to grow and fully staff the PICU, a minimum of 3 full time Physicians will be necessary. Group will provide Physicians for call coverage in the Department on a 24 hour basis every day during the Term of this Agreement with in-house call coverage provided only when there is a pediatric inpatient in the Department who meets the Critical Care criteria. The Critical Care criteria is met in the following cases:

Airway.
Patient with an unstable airway or the need for an artificial airway.

Breathing.
All patients in respiratory failure requiring mechanical support with either invasive or non-invasive mechanical ventilation.
All patients in imminent respiratory failure.
Patients who have persisting apnea that is not self-correcting.
Patients who have persistent arterial desaturation despite a high FiO2 by conventional means.

Circulation.
Patients with an unstable or potentially unstable circulation despite adequate fluid resuscitation.
Patients who require acute pharmacologic or mechanical support of the circulation. (inotropic, vasodilators)

Neurological.
Patients with an acutely diminished level of consciousness or a decreasing level of consciousness.

Patients in status epilepticus.

Renal.
Patients requiring extracorporeal organ support, including acute renal support (CRRT) or having a complication of renal failure resulting in any of the above.

Hepatic.
Patients with fulminant hepatic failure requiring intensive support.

Postoperative Admissions.
Tracheostomy (fresh trach (48h or as requested by ENT)
Cardiac surgery
Spinal instrumentation complicated with another organ system compromise.
Renal transplantation
Liver transplantation
Tracheostomy
Major intracranial surgery
Major interventional cardiology procedure

On or before the first day of each calendar month, Group shall provide to the Hospital CEO a schedule of Physicians assigned to provide call coverage in the Department during the calendar month and such schedule shall be posted within the Department.

VHS.000293

**Pediatric Procedural Sedation Service (PPSS)**: Group will provide this service to Hospital inpatients, as well as pediatric outpatients. The PPSS will be available for pediatric procedures which cannot be performed without the aid of mild, moderate, or deep sedation. Provided that procedures which require PPSS are scheduled, the PPSS will be available 5 days a week (Monday through Friday from 0700 to 1300 with emergency sedation coverage provided up to 1500), or as otherwise agreed by the parties in writing. Hospital will provide fully trained competent nursing personnel as needed for the uninterrupted operation of the PPSS. The PPSS will be administered under controlled conditions in dedicated units such as the PPSU, GI labs, PICU, General Pediatric Floor, Radiology, Neurology, etc., as mutually agreed upon by the parties.

VHS.000294

# EXHIBIT C

## COMPENSATION

A. **BILLING AND COLLECTION.** Hospital shall be responsible for billing for all Hospital and Facility services pursuant to this Agreement, and Hospital shall have the exclusive right to collections therefrom. Group shall be responsible on Physicians' behalf for billing patients and/or appropriate third party payors within the timely filing deadlines as mandated by, or agreed to with, payor, and shall promptly and diligently pursue collection. Group shall have the exclusive right to collections therefrom except as provided herein. Failure of Group to bill as specified herein shall result in imputed Collections being deemed collected in the month in which the last day to file claims for that payor for the respective Services were rendered, for purposes of calculating any amounts due Group under this Exhibit C. Group shall notify Hospital of any Services rendered and not billed in accordance with this section in the documentation set forth in B.(2) below. The term "Collections" as used herein means all monthly fees and charges resulting and collected from Group's and each Physician's performance of professional medical services for patients at Hospital under this Agreement less refunds, recoupments, offsets, and adjustments due to payor therefrom.

B. **GUARANTEE AGAINST COLLECTIONS.**

(1) **Fee.** Provided Group is in compliance with the provisions of this Agreement and Exhibit, during each year of the Term of this Agreement (each 12-month period shall be hereinafter referred to as a "Guarantee Period"), Hospital hereby agrees to guarantee that Group's annual Collections shall not be less than One Million Six Hundred Fifty Thousand and No/100 Dollars ($1,650,000) ("Total Annual Guaranteed Amount") or One Hundred Thirty-seven Thousand Five Hundred and NO/100 Dollars ($137,500.00) per month ("Monthly Guaranteed Amount").

Beginning with the first day of each month and continuing thereafter during of the Guarantee Period ("Pay Date") or extended as set forth below, Hospital shall pay the Monthly Guaranteed Amount (or the Monthly Guaranteed Amount offset by the monthly Collections as provided hereinafter) to Group. The next monthly Pay Date may be extended by the number of days in which the report of Collections has exceeded the Report Day, as defined herein. By way of example, if Group tenders the report of Collection on March 10th rather than March 5th, then the Pay Date of the next Monthly Guaranteed Amount shall be due by Hospital on April 6th rather than April 1st. Beginning with the second month of the Guarantee Period, not later than the fifth day of each month (or the next business day if the fifth day is a holiday or weekend) ("Report Day"), Group shall report to Hospital the monthly Collections for the previous calendar month. If the monthly Collections for the previous month are less than the Monthly Guaranteed Amount, Hospital shall offset the next Monthly Guaranteed Amount due by the amount of monthly Collections (using the table in Section C(1) of this Exhibit C to determine the amount of monthly Collections to apply as an offset against the next Monthly Guaranteed Amount). If the monthly Collections for the previous month are greater than the Monthly Guaranteed Amount, then no Monthly Guarantee Amount shall be paid by Hospital to Group when the next Monthly Guaranteed Amount is due. Upon Hospital's request from time to time, Group shall permit

Hospital to conduct audits of the relevant books and records pertaining to this Guarantee. If any such audit discloses that Hospital paid more that required hereunder for any month, Group shall reimburse Hospital for all such excess amounts within 30 days of demand by Hospital.

### C. RECONCILIATION.

(1)     Not later than ninety (90) days, or as soon thereafter as reasonably possible after the end of each Guarantee Period, Hospital shall cause a reconciliation to be performed of (a) the Collections for that Guarantee Period ("Total Collections"), and (b) the Collections during the sixty (60) day period following the Guarantee Period that are attributable to the Guarantee Period ("Post Guarantee Collections"), and (c) the total monies paid by Hospital under Section B above ("Cumulative Payments") during the Guarantee Period. The sum of the Total Collections, Post Guarantee Collections and Cumulative Payments shall be defined herein as "Total Income". For the purposes of this reconciliation calculation, Total Collections shall be applied as follows:

| Group's Total Collections | Applied to offset Total Annual Guaranteed Amount | Retained by Group |
|---|---|---|
| $0 - $500,000 | 100% | 0% |
| $500,001 - $700,000 | 50% | 50% |
| $700,001 - $1,650,000 | 33% | 66% |
| > $1,650,000 | 0% | 100% |

(2)     The Hospital shall provide the results of the reconciliation to Group upon completion of the reconciliation. Not later than thirty (30) days following the receipt of the reconciliation report, Group shall notify Hospital in writing of any discrepancies, providing sufficient detail to permit the parties to fully evaluate the matters at issue. The absence of written dispute shall be considered an acceptance of the reconciliation report as written.

(3)     If the Total Income during the Guarantee Period exceeds the Total Annual Guaranteed Amount for that Guarantee Period, then Group shall, beginning no later than the first (1st) day of the second month following the date of reconciliation, repay to Hospital the entire said excess funds, within thirty (30) days, but the amount due Hospital shall not exceed the Cumulative Payments made by Hospital. Notwithstanding any other provision of this Agreement, in no event shall the amount due Hospital under this Exhibit C be forgiven or waived upon the expiration or termination of this Agreement.

(4)     Upon Hospital's request at any time, Group shall permit Hospital to conduct an audit of the relevant books and records pertaining to this guarantee. Group shall also make all relevant books and records available for audit as are necessary to verify Group's report of collections with third party statements. If such audit discloses that Hospital paid more than required hereunder for any month, Hospital shall reduce the following payment due by Hospital by the amount of the excess amount, and if no payment is due by Hospital, Group shall promptly reimburse Hospital for such excess amount. Hospital's right to conduct audits and to credit and offset excess amounts, if Collections ultimately exceed the Total Annual Guaranteed Amount, and Group's obligations to reimburse or repay Hospital under this Exhibit C, shall survive the expiration or earlier termination of this Agreement. Failure to cooperate fully in any such audit or in the reconciliation shall be cause for termination under Section 6.a of the Agreement.

VHS.000296

D.    **ENTIRE COMPENSATION.**  Except as otherwise set forth in Subsection 4.b. of the Agreement, Group's separate billings and any Cumulative Payments shall constitute its sole compensation for all administrative and professional services rendered hereunder, including services rendered by Physicians and Director.   Group shall have the sole responsibility to compensate Physicians, and Director.   Group reserves the right, in its sole discretion, to determine the compensation payable to each Physician working in the Department.   Group hereby agrees to indemnify and hold Hospital harmless from any and all claims, costs and/or liability suffered or incurred by Hospital in connection with any claims for compensation by such Physicians for Services rendered hereunder.  The indemnification obligations herein stated in this Section shall survive the termination and/or expiration of this Agreement.

VHS.000297

## EXHIBIT D

### EXISTING DIRECTORSHIP OR ADMINISTRATIVE SERVICES ARRANGEMENTS

VHS.000298

EXHIBIT "B"

# PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered on this 17th day of March, 2015 ("Effective Date") by and between **PEDIATRIC INPATIENT CRITICAL CARE SERVICES, P.A.**, a Texas professional association ("Association") and **MELVIN G. PERRY, JR., M.D.** ("Physician").

WHEREAS, Association is a professional association organized under the laws of the State of Texas to provide professional medical services and services ancillary thereto.

WHEREAS, Association has entered into the Agreement for Pediatric Intensive Care Department Coverage with VHS San Antonio Partners, LLC d/b/a North Central Baptist Hospital ("NCBH") for the coverage of North Central Baptist Hospital's pediatric intensive care unit as well as for the provision of professional medical services to include without limitation to pediatric procedural sedation services ("Coverage Agreement"), and Association desires to contract with Physician to provide such professional medical services on behalf of Association in accordance with the terms and conditions of the this Agreement.

WHEREAS, Physician has an unrestricted license to practice medicine in the State of Texas and desires to contract with Association to provide the Services as herein described in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, for and in consideration of the recitals above and the mutual covenants and conditions contained herein, Association and Physician agree as follows:

1. **Term**. This Agreement shall commence on the first (1st) day Physician provides Services under this Agreement (the "Commencement Date") after and subject to the successful completion of all pre-employment processes of Association, including but not limited to, payor contracting, background review, evidence of professional liability insurance coverage, completion of all federal and state requirements with respect to Medicare and Medicaid, and credentialing by NCBH of Physician ("Credentialing Process"). As of the Effective Date, it is anticipated by the parties hereto that the Credentialing Process will be completed on or around March 30, 2015. If the Credentialing Process is not completed by March 30, 2015, then Association, in its sole discretion, may terminate this Agreement and neither party shall have any obligation to the other, or extend the date to complete the Credentialing Process. The term of this Agreement shall commence on the Commencement Date and continue thereafter unless terminated in accordance with this Agreement.

2. **Engagement and Scope of Practice; Relationship Between Parties**.

(a) Physician agrees to provide call coverage services and render professional medical services in the specialty of pediatric critical care medicine exclusively for, except with advance written consent of Association pursuant to Section 7 of this Agreement, and on behalf of Association within the scope of Physician's license at North Central Baptist Hospital in San Antonio, Texas ("NCBH") consistent with the terms and conditions set forth in this Agreement on a schedule as determined by Association (collectively referred to as "Services" under this Agreement). Such Services shall be rendered in a competent, professional and ethical manner, in accordance with prevailing standards of medical practice in the relevant community. Physician shall at all times act and deliver Services in a manner consistent with (i) applicable standards of the Joint Commission and any other relevant accrediting organizations; (ii) all applicable bylaws, rules regulations, procedures, and policies of NCBH and its medical staff; (iii) the Principles of Medical Ethics of the American Medical Association; and (iv) all applicable laws, regulations, rules, orders and directives of any and all applicable governmental and regulatory bodies having competent jurisdiction.

PICCS 000105

**(b)**    Physician shall comply with the terms of this Agreement and cooperate with North Central Baptist Hospital in carrying out the provision of Services under this Agreement. As required by NCBH and this Agreement, Physician shall i) execute the Physician Agreement attached hereto as **Exhibit A** and ii) provide to Association a list of Physician's existing directorship or administrative services arrangements, if any; and deliver such Physician Agreement and list of arrangements to Association contemporaneously with the execution of this Agreement. The obligation of Physician to provide and update the list of existing directorship or administrative services arrangements shall be ongoing while this Agreement is in effect.

**(c)**    Physician agrees to comply with any administrative and clinical policies, rules, and procedures of Association (including, but not limited to, any utilization management, quality improvement program, peer review process, privacy practices, and compliance program), which may be implemented and/or amended in the Association's sole discretion from time to time. Further, Physician agrees to be bound by all of the standards, policies, rules, and regulations adopted or utilized by third party payors from time to time including Medicare and Medicaid ("Payors") which cover his Services.

**(d)**    The relationship between Association and Physician is that of an independent contractor. Physician has no authority to enter into any contract binding Association or to create an obligation on behalf of Association without written authorization from Association. In the performance of the work, duties, and obligations specified in this Agreement, it is understood and agreed by the parties that Physician is at all times acting and performing as an independent contractor to Association. Association shall not withhold taxes, social security, unemployment insurance, workers' compensation, or any other withholding or payment established pursuant to any law or the requirements of any governmental body or make available to Physician any of the benefits afforded to employees of Association. All such payments, withholdings and benefits, if any, are the sole responsibility of Physician and Physician accepts responsibility for the payment of any such compensation for the performance of Services rendered under this Agreement.

**3.    Representations and Warranties of Physician.** Physician represents and warrants on or before the Commencement Date and thereafter throughout the Term of this Agreement, Physician:

**(a)**    has a valid and unrestricted license to practice medicine in the State of Texas;

**(b)**    will provide Services in compliance with all applicable local, State, and federal laws, rules, regulations and with the requisite standards of care;

**(c)**    is enrolled to participate in Medicare and Medicaid under Title XIX of the Social Security Act or other applicable State laws pertaining to Title XIX of the Social Security Act;

**(d)**    has active medical staff privileges at NCBH and at other facilities as directed by Association from time to time;

**(e)**    has a current DEA narcotic registration certificate;

**(f)**    shall maintain such licensure, board certification by the American Board of Pediatrics, medical staff privileges at NCBH, and all continuing education requirements to include without limitation to American Board of Pediatrics recertification and registrations;

**(g)**    has no knowledge of any actual, pending or threatened malpractice claim or demand for payment made against Physician, or incident which is likely to give rise thereto, and if so, Physician shall disclose such information as to such claim, demand, or incident when such event first becomes known to Physician;

**PICCS 000106**

(h)     will act in accordance with all applicable state, and federal statutes and regulations, all policies and procedures promulgated from time to time by Association, and in a manner that will not injure the reputation of Association or Association's physicians or employees;

(i)     is not currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the "Federal health care programs"); is not convicted of a criminal offense related to the provision of health care items or services but has not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal health care programs, and is not under investigation or otherwise aware of any circumstances which may result in Physician's being excluded from participation in the Federal health care programs; and

(j)     shall be solely responsible for Physician's exercise of his independent medical judgment in the performance of Services under this Agreement.

The representations, warranties, and covenants contained in this Section shall be ongoing representations, warranties, and covenants during the Term of this Agreement, and Physician shall immediately notify Association of any change in the status of the covenant, representation, or warranty set forth in this Section. Any failure by Physician to timely notify Association shall give Association the right to immediately terminate this Agreement for cause.

**4.     Physician's Services**.  The delivery of professional medical services by a physician requires the exercise of independent medical judgment that is not and cannot be within the right of control of any person or entity other than a licensed physician providing the direct hands on care to a patient. Association and Physician acknowledge that Association does not have the control or the right to control the manner, means, and details of Physician in such regard and shall take no action to do so.  Rather, insofar as the healthcare decisions are made in providing medical or surgical services to a patient under this Agreement, Physician shall, at all times, be regarded as acting in his individual capacity as an independent contractor and not as an employee of Association as that term is utilized in Section 301.010 of the Texas Business Organizations Code.

**5.     Credentialing and Participation Criteria**.  Physician agrees to be subject to and comply with credentialing guidelines and participation criteria identified by Payor(s) and/or as set by Association.

**6.     Quality Assurance**.  During the delivery of Services under this Agreement, Physician controls the quality and manner in which Physician's Services are rendered to patients. The quality of Physician's Services may be monitored under any quality assurance program instituted by Association ("Program") and Physician shall cooperate with any reasonable risk prevention or risk management activities established or adopted by Association from time to time.  Physician further agrees to provide such records and other information as may be required or requested by Association under such Program.  Nothing in this Agreement including Physician's participation in the Program shall be construed to interfere with or in any way affect Physician's obligation as a licensed physician to exercise his independent professional medical judgment when rendering health care services to patients.

**7.     Loyalty to Association**.  During this Agreement and except to the written consent is given as stated herein, Physician shall devote Physician's full, entire and undivided professional time and attention to the practice of medicine for Association and in furtherance of Association's best interests. Physician shall not engage in professional work for pay, compensation or other remuneration in Physician's individual capacity or in association with others not employed by Association, nor receive any compensation therefore, without the express written consent of the Board of Directors of Association; however, Section 7 is not intended to require Physician to obtain Association's consent for such activities

PICCS  000107

of Physician during Physician's scheduled time off to include Physician's request to provide his professional services to an urgent care facility located outside of the state of Texas.

**8.    Compensation, Benefits, and Expenses.**

      **8.1.    Compensation.** Commencing on the Commencement Date and in exchange for the performance by Physician of the Services set forth in this Agreement and so long as this Agreement and the Coverage Agreement are in full force and effect and Physician continues to provide Services in compliance with such Agreements, Association shall compensate Physician at a rate based on an annual gross compensation of THREE HUNDRED TWENTY THOUSAND AND NO/XX DOLLARS ($320,000.00), subject to reduction of any Adjustments as defined herein. All compensation shall be payable retrospective on a monthly basis in accordance with Association's payroll cycles then in effect from time to time. Under no circumstances shall Physician bill directly any patients or Payors for Services provided pursuant to this Agreement. Physician shall work cooperatively with and among other Association physicians to arrange and coordinate coverage of temporary absences of physicians, including Physician, due to vacation, sickness, or any other reason, regardless whether planned or unplanned. In the event Physician does not obtain another Association physician to cover any scheduled or assigned hours, shift or day of Physician and such hour(s), shift(s) or day(s) is not worked by Physician, Physician's compensation shall be reduced by ONE HUNDRED FIFTEEN AND NO/XX DOLLARS ($115.00) for each hour (or portion thereof) affected ("Adjustments").

      **8.2    Benefits**. Physician shall not be entitled to any benefits including those furnished to employees of Association.

      **8.3    Expenses**. Physician may incur ordinary, necessary, and reasonable expenses relating to automobile, auto insurance, cell phone, subscriptions and fees, license and dues, educational expenses, and other similar items. Physician shall carry a cell phone to facilitate communication between Association and Physician. All of the foregoing expenses shall be borne solely by Physician.

      **8.4    Disallowances**. Any payments, reimbursements, or credits made to Physician or for his benefit by Association for expenses incurred by Physician and reimbursed by Association which shall be disallowed in whole or in part as a deductible expense by the Internal Revenue Service, shall be reimbursed by Physician to Association to the full extent of such disallowance. In lieu of direct repayment by Physician, Association may, at its sole discretion, withhold from Physician's Compensation the amount of the disallowance until such total amount has been fully recovered. This Section 8.4 shall survive any termination of this Agreement.

    **9.    Facilities**. The Services are primarily performed at North Central Baptist Hospital which is maintained by North Central Baptist Hospital. Physician shall have an open and timely dialogue with Association regarding the availability of space, equipment, supplies and technical staff at North Central Baptist Hospital.

    **10.    Fees**. Association shall have the exclusive authority to determine the amount and nature of all fees and the procedure for establishing the fees to be charged patients. The parties acknowledge and agree that all fees generated, monies received and all accounts receivable derived from Services provided by Physician pursuant to this Agreement shall be the sole property of Association and Physician shall have no right or interest therein. Physician expressly and irrevocably transfers, assigns, or otherwise conveys to Association any and all rights, privileges, or other basis Physician has to collect or account for fees, whether in cash or goods or other items of value resulting from or incident to Physician's performance of services under this Agreement and hereby appoints Association or Association's designee as attorney-in-fact for collection of such fees or otherwise enforcing the Physician's interests herein. Further, Physician hereby assigns to Association, any right Physician may have from time to time to bill any Payor including, without

PICCS 000108

limitation, Medicare and Medicaid, for any Services. Physician acknowledges that Association or its agent shall submit these billings in Association's name, and that Physician is hereby precluded from billing any Payor for Physician's Services hereunder. Physician shall execute any documents necessary to effectuate this assignment with respect to governmental and private reimbursement programs.

**11.** **Documentation, Coding, and Patient Privacy.** Physician shall timely and accurately prepare all patient files, records, charts, reports, correspondence and forms immediately after Services are rendered consistent with prevailing standards of medical practice in Physician's relevant community and in conformity with Payors' documentation and coding policies, rules and regulations. Physician shall be responsible for the accuracy of the documentation and coding of Services rendered to enable Association to properly timely and accurately bill and collect for such Services. In addition, Physician agrees to and shall comply with the Health Insurance Portability and Accountability Act ("HIPAA") and its implementing regulations with respect to the privacy of patient information. At all times during this Agreement and thereafter, all patient lists, files, records including billing records, charts, films, practice manuals, referral lists, and trade secrets (collectively referred to herein as "Records") pertaining to and utilized in Association's medical and business practices are exclusively the assets of Association, but are made available to Physician in support of Physician's work while providing Services under this Agreement. Physician shall not use, release or disclose any Records without the express prior written consent of Association and only in connection with the provision of Services under this Agreement. Under no circumstances shall Physician make or remove copies or originals, including patient files and records, from Association's offices for any purpose unless written approval is given in advance by Association and only to the extent such approval is granted. As such, the Records shall remain with Association upon the termination, for any reason, of this Agreement. Physician acknowledges and agrees that this Section 11 survives any termination of the Agreement.

**12.** **Professional Liability Insurance.** Physician shall maintain, at Physician's sole expense, a professional liability insurance policy covering Physician for acts and omissions of Physician during the Term of this Agreement. Physician shall, at all times, fulfill all requirements and conditions necessary to be covered and remain insurable for professional liability insurance purposes to practice in Physician's medical specialty. Such insurance coverage shall be purchased and maintained in accordance with Association's policies as amended from time to time with coverage limits of at least $200,000 per claim and $600,000 in the aggregate or at other levels and coverage terms as determined appropriate from time to time by Association. Upon termination of this Agreement and provided that Physician's policy was a claims made rather than an occurrence made policy, Physician shall pay the premium necessary to purchase a reporting endorsement on Physician's professional liability insurance or shall continue Physician's existing coverage with coverage for prior acts and assure that: (i) there are no gaps or lapses in coverage; (ii) that any change in carriers will provide coverage for prior acts with a retroactive date to the effective date of this Agreement; and (iii) that such insurance will be maintained until the longest statute of limitations applicable to services provided by Physician under this Agreement has expired. Proof of payment or continuation of Physician's coverage shall delivered to Association within fifteen (15) days after the date of termination of this Agreement and at any time after termination when there is a change in carriers after choosing to continue Physician's existing coverage with prior acts to cover the Term of this Agreement. This Section 12 shall survive termination of the Agreement.

**13.** **Indemnification.** To the extent allowed by state law and not covered by Physician's insurance policy, Physician agrees and shall indemnify and hold harmless Association and its directors, officers, employees, agents, and representatives, from and against any and all claims, damages, losses, liens, encumbrances, causes of action, suits, settlements, awards and/or judgments ("Claims") resulting from or arising out of acts or omissions of Physician relating to Physician's exercise of independent medical judgment in the provision of Services or any dealing with a patient including all costs and expenses of investigation, defense and/or resolution of such Claims (including, without limitation, attorney's fees, expert witnesses, and other reasonably related costs and expenses including any internal costs incurred by

PICCS 000109

Association). Association agrees to give Physician prompt notice of any Claim and provide commercially reasonable cooperation to Physician in the investigation and defense of such Claim.

14. **Reporting Adverse Actions**. Physician shall immediately notify Association in writing when Physician becomes aware of the following matters during the Term of this Agreement:

(a)    notice of any actual or proposed Adverse Action (as hereinafter defined), whether final or not, taken against Physician by any hospital, institution, insurance company, HMO, PPO, other third-party payer, governmental agency or professional review organization. "Adverse Action" shall mean any action by any entity that results in the reduction, restriction, suspension, revocation or denial of, or failure to renew any credentials, privileges, authorizations, memberships or participation in practice;

(b)    notice that any complaint or report has been filed with the Texas Medical Board or with the National Practitioners Data Bank regarding Physician;

(c)    a summons, complaint, written claim, or other document alleging professional negligence or injury to persons or property arising from medical practice, whether before, during or after the Term of this Agreement;

(d)    any criminal complaint, indictment or criminal proceeding in which Physician is named as a defendant;

(e)    any actual or threatened investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against Physician of filing false health care claims, violating anti-kickback laws, violating fee-splitting laws, or engaging in billing improprieties;

(f)    any actual or threatened allegation, or any investigation or proceeding based on any allegation, against Physician for violating professional ethics or standards, or engaging in illegal, immoral or other misconduct (of any nature or degree);

(g)    has any monetary penalties or other punishment, sanctions, or enforcement actions by any state or federal agencies including without limitations to any payment holds on Medicare or Medicaid programs or other federal or state healthcare programs; and

(h)    any denial or withdrawal of an application in any state for licensure as a physician, for medical staff privileges at any hospital or other health care entity, for board certification or recertification, for state or federal controlled substances registration, or for malpractice insurance.

Whenever Physician is required to provide Association with any written notice pursuant to this section, such written notice shall contain all the information then-available, and updated as information becomes available, for a reasonable understanding of the facts and circumstances underlying such notice.

15. **Termination of Agreement**. This Agreement shall be terminated upon the occurrence of any of the following:

15.1    **Voluntary Termination**. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated without cause by Association or Physician at any time after the expiration of the first twelve months following the Commencement Date upon ninety (90) days prior written notice to Physician or such shorter period if mutually agreed upon in writing by Association and Physician. During the notice period, Physician shall continue to perform on a full-time basis the duties assigned to Physician by Association and comply with the terms and conditions of this Agreement.

PICCS 000110

**15.2     Automatically and immediately upon –**

(i)     Physician's death;

(ii)     Physician's permanent disability. The term "disability" shall be defined as a physical or mental impairment that causes the Physician to be unable to perform the essential functions of his job as set forth in this Agreement, with or without reasonable accommodation, for a period of more than thirty (30) days as determined by a physician selected or agreed to by Association;

(iii)     Physician's license to practice medicine is suspended, placed on probation, revoked, or canceled or a restriction or limitation by any governmental authority having jurisdiction over Physician is placed or imposed upon him so that he cannot perform the professional services for which he was engaged hereunder;

(iv)     Physician is terminated or suspended from Medicare, Medicaid or other state or federal government healthcare entitlement program, or any successor program;

(v)     Physician is convicted of a felony or a crime of moral turpitude;

(vi)     Physician conducts himself in a manner that Association determines in good faith to be unethical, unprofessional, unlawful, or fraudulent, is detrimental to patient care, or impairs the reputation or operations of Association;

(vii)     Upon cancellation of the malpractice coverage insuring Physician;

(viii)     Upon the determination by Association that Physician has reported to work with a measurable quantity in blood or urine of non-prescribed narcotics, hallucinogenic drugs, marijuana or other non-prescribed controlled substances, or that Physician is working while impaired by alcohol or narcotics;

(ix)     Upon NBCH's request in accordance with its Medical Staff Bylaws for the removal of Physician due to not meeting the standard of care for rendering patient care services, or that the health, safety, or welfare of patients could be jeopardized by continued services of Physician;

(x)     Physician becomes debarred, excluded, or suspended, or if any other event occurs that makes Physician an Ineligible Person. An "Ineligible Person" is an individual who: (i) is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs; or (ii) has been convicted of a criminal offense that falls within the range of activities described in 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible;

(xi)     Failure by Physician to notify Association of Adverse Actions pursuant to Section 14 of this Agreement;

(xii)     Any termination or non-renewal of the Coverage Agreement, or the provision of Physician's services under the Coverage Agreement are suspended, or Physician is otherwise removed from providing services under the Coverage Agreement; or

PICCS  000111

(xiii)    Association's breach of this Agreement, if such breach is not cured within thirty (30) business days after receipt of written notice to the Association, unless Association begins to cure during the 30-business day period and diligently continues to cure thereafter.

**15.3**    <u>Effect of Termination</u>. Except as expressly stated otherwise in this Agreement, this Agreement and the obligation of Association to Physician for the payment of Compensation shall cease on the date of any termination of this Agreement. The termination of this Agreement shall not affect the rights of the parties that have accrued prior to the effective date of the termination and such rights shall survive any termination of this Agreement. Following any termination of this Agreement hereunder unless waived by Association, Physician shall fully cooperate with Association in all matters relating to the winding up of Physician's pending work on behalf of Association and the orderly transfer of such work to other physicians of Association.

**15.4**    <u>Notification to Patients</u>. In the event of any termination of this Agreement, it is agreed that Association shall have the sole authority to determine the manner, method, timing, and contents of notice given to patients regarding Physician's departure from Association. All expenses of notification to patients shall be at Physician's sole expense. Association's decision as to form and method of such notification shall be binding upon Physician. Any such notification shall be in a manner consistent with applicable laws and regulations.

**16.**    <u>**Defamation**</u>. Physician and Association covenant and agree that in no event, and at no time during the Term of this Agreement or at any time thereafter, shall either of them disparage, denigrate, slander, libel or otherwise defame the other or the other's businesses, services, properties or assets, or physicians, personnel, agents, or representatives.

**17.**    <u>**Confidentiality and Non-Solicitation**</u>.

**17.1**    <u>Confidential Information</u>. During the Term of this Agreement, Physician will be placed in a position by Association so as to have access and exposure to Confidential Information relating to Association's business practices and its patients. "Confidential Information" includes, but is not limited to, the Coverage Agreement, this Agreement, accounting and financial information relating to Association's practice, patient lists, patient records and files, marketing and pricing information, business plans, operation methods, internal publications, intellectual property, Payor and facility contracts, referral sources, and any other materials not identified to Physician by Association as non-confidential. Confidential Information may be in written form, capable of being converted to written form, or stored by electronic, magnetic, optical or other imaging technologies, including computer programs. In further consideration for Association entering into this Agreement and for the material benefits that come from this relationship, such as compensation and experience, Physician shall not, at any time, during or after termination of this Agreement with Association regardless of cause or no cause:

i.    copy, take, or use any Confidential Information, other than for Services under this Agreement, without the prior written consent of Association; or

ii.    disclose or divulge, or attempt to disclose or divulge, to any other person or entity, or use for Physician's own benefit or for the benefit of any person or entity, directly or indirectly, any Confidential Information relating to Association, its officers, or directors;

iii.    take any action which might reasonably or foreseeably be expected to compromise the confidentiality or proprietary nature of any of the Confidential Information; or

PICCS 000112

       iv.    fail to follow the reasonable rules made by Association from time to time regarding the confidential and proprietary nature of the Confidential Information.

The provisions of this Section 17 shall not apply (i) to any Confidential Information which is patient information, the disclosure of which has been properly authorized by the patient in question or by such patient's authorized representative pursuant to applicable federal and state law, and such authorization is not gained, in whole or in part, by or through prohibited conduct in violation of any provision of this Agreement, and is for the purpose of rendering Services under this Agreement; or (ii) to any Confidential Information which is required to be disclosed by law or an order of any court of competent jurisdiction.

       **17.2**   <u>Non-Solicitation</u>. Association and Physician acknowledge and agree that a strong relationship and connection exists between them and, as a result of Physician's contractual relationship with Association under this Agreement, their relationship will be further developed between Physician, Association, and North Central Baptist Hospital. Association's goodwill and legitimate business interests are inextricably intertwined with such relationships, hospital and connections and that these restrictive covenants are specifically and narrowly tailored and designed to protect Association's interests. Physician further acknowledges and agrees that the covenants described in this Section 17.2 are designed to enforce, and are ancillary to or part of, the promises contained in this Agreement and are reasonably necessary to protect the goodwill and business interests of Association including but not limited to, the following: (1) the use and disclosure of the Confidential Information as described in Section 17.1; (2) Association's professional development activities; (3) the mutual interests between and among all physicians employed or contracted by Association to promote the interests of Association and of each other without concern that such efforts may be used for the benefit of third-parties or in any way adverse to Association; (4) the goodwill of Association, as promoted by Physician; (5) the promotion of Physician's proficiency, reputation and goodwill by Association through Physician's use of Association's name, practices, methods, Confidential Information, and trade secrets; and (6) the protection of Association's practices, methods, Confidential Information, and trade secrets described in this Agreement. The foregoing list is an example only and shall not be construed as an exclusive or exhaustive list of such interests. Physician further acknowledges that Association has devoted or will devote a considerable amount of time, effort, and expense in establishing Association's business relationships, and in hiring and training Association's providers and staff; and further that the business relationships, providers, and staff comprise valuable assets of Association. Physician acknowledges and agrees that Physician's responsibilities under this Agreement creates a special relationship of trust and confidence between Association, Association's staff, referral sources, hospitals especially North Central Baptist Hospital, Payors, and Physician. Physician acknowledges and agrees that this special relationship of trust and confidence creates a high risk and opportunity for Physician to misappropriate these relationships and the goodwill existing between Association and other such persons and entities. As a result of this Agreement, Physician will have access to such assets of Association, including but not limited to, staff, patients, referral sources, hospital relationships, and other sensitive, confidential and proprietary information of Association. If Physician violates this Section, Physician recognizes and acknowledges that Association will suffer irreparable harm to its business. Therefore, Physician acknowledges and agrees that it is fair and reasonable for Association to take steps to protect itself from the risk of such misappropriation and to protect the valuable assets of Association. Physician agrees that Physician shall <u>NOT</u> in any manner or by any means, directly or indirectly, for Physician or on behalf of any other corporation, association, partnership, firm, person or any other entity (whether as an individual, agent, servant, employee, employer, officer, director, shareholder, investor, principal, consultant or in any other capacity):

PICCS 000113

i.        take any action, during this Agreement and for a period of one (1) year after the termination of this Agreement for any reason ("Restricted Period"), that would interfere with, diminish or impair the valuable relationships that Association has with Payors, referral sources, patients, hospitals or other health care facilities;

ii.        during Restricted Period, induce, solicit, or influence; or attempt to induce, solicit, or influence; or aid, assist and abet; any other party or person in inducing or attempting to induce, solicit, or influence, to terminate or otherwise interfere with the relationship of any employee, independent contractor, or agent of Association with Association; and

iii.        without advance unanimous written consent of the Board of Directors of Association, offer or solicit to contract, or contract with (or attempt to offer or solicit to contract, or contract with) NCBH so long as this Agreement is in effect or any contract between the Association and NCBH (including without limitation to any renewals, amendments or revisions thereof) are in effect including any time after the termination of this Agreement; provided however, nothing herein is intended to prevent Physician from obtaining or maintaining medical staff privileges or providing the professional medical services to Physician's patients at NCBH.

**17.3**    Reasonable Restrictions.  Physician agrees that the covenants in Section 17 are necessary to protect Association's business interests and assets, the limitations contained in Section 17 are reasonable, and any breach by Physician will cause Association to suffer irreparable harm. Physician warrants and represents that enforcement of this covenant will not work an undue hardship on Physician and that all terms of this Section 17 are reasonable and enforceable in full as written. Physician acknowledges Physician's receipt of sufficient good and valuable consideration supports enforcement of this covenant.  If Physician breaches this Section, Physician shall abide by any and all temporary restraining orders or injunctions which may be issued in enforcement of this Section 17. The covenants contained herein survive any termination of this Agreement and, to the extent permitted by applicable law, shall be deemed independent and separately enforceable covenants and are enforceable independent of (i) other covenants and conditions of this Agreement and (ii) any other cause of action, or rights or remedies, either party may have hereunder or otherwise, none of which shall be deemed defenses hereunder.

**17.4**    Injunction and Reformation.  The parties acknowledge and agree that (i) the covenants and restrictions contained in Section 11 with respect to Records and Patient Privacy and this Section 17 ("Confidentiality and Non-Solicitation") are necessary, fundamental, and required for the protection of legitimate business interests of Association; (ii) such covenants and restrictions relate to matters that are of a special, unique, and extraordinary character; and (iii) a breach of any such covenants or restrictions will result in irreparable harm and damages to Association that cannot be adequately compensated by a monetary award.  Accordingly, the parties expressly agree that in the event of an actual or threatened breach by Physician in connection with the patient privacy or the Records in Section 11 or the restrictive covenants of this Section 17, Association shall be entitled to injunctive relief, including, but not limited to a temporary restraining order, a preliminary and/or permanent injunction to restrain Physician and Physician's partners, agents, representatives, servants, employers, employees, and/or any and all persons acting directly or indirectly by, through, or with Physician, to prevent or restrain any such breach or continuing breach of Sections 11 or 17.   If Association seeks an injunction, Association need not show proof of actual damage and Physician waives the necessity of posting a bond, cash or otherwise by Association. The existence of any claim on the part of Physician against Association, whether arising from this Agreement or otherwise, shall not constitute a defense to the granting or enforcement of this injunctive relief.  Physician shall abide by any and all temporary restraining

PICCS 000114

orders or injunctions which may be issued in enforcement of Sections 11 and 17. Such remedy is not exclusive and is in addition to any other remedies now or thereafter existing at law or in equity, by statute or otherwise. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law. Association is entitled to withhold any and all compensation or payments due hereunder while the breach continues. Further, nothing herein shall be construed as prohibiting compensation to Association for such breach or threatened breach, including (but not necessarily limited to) recovery of damages from Physician and for reasonable attorneys' fees.

17.5    The provisions of this Section 17 shall survive the expiration or any termination of this Agreement.

**18.    Notice.** All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally, or sent by either certified or registered mail, return receipt requested, postage prepaid, or by overnight courier guaranteeing next day delivery to Physician's last known residence or to Association's principal business address. All notices shall be deemed to have been received on the date of delivery thereof, if delivered by hand, on the third day after the mailing thereof, if mailed, and on the next day after the sending thereof, if by overnight courier. Either party may amend the address for notice at any time upon providing the other party written notice thereof.

**19.    Amendments.** This Agreement may be modified or amended only upon mutual agreement in writing by both parties hereto.

**20.    Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the parties, their spouses, successors, heirs and personal representatives, and permitted assigns.

**21.    Entire Agreement; Construction.** This Agreement and its exhibits, and any amendments or addenda hereto constitute the entire agreement between the parties regarding the subject matter hereof and supersede all prior or contemporaneous discussions, representations, correspondence, offer letters, memoranda and agreements, whether oral or written, pertaining thereto. Both parties agree to conduct their relationship in accordance with the terms of this Agreement and not pursuant to any undocumented arrangements, side arrangements (whether written or oral), or the like. By executing this Agreement, the parties acknowledge that they have had the opportunity to be represented by independent counsel, and have had the opportunity to review and consider its terms. The language of this Agreement shall be construed as a whole according to its fair and common meaning. The various titles of the articles and paragraphs herein are used solely for convenience and shall not be used for interpretation or construing any word, clause, paragraph, or subparagraph of this Agreement.

**22.    Waiver of Breach.** The waiver by any party hereto of any breach of any provision of this Agreement by the other shall not operate or be construed as a waiver of any subsequent breach by the other.

**23.    Governing Law.** THIS AGREEMENT SHALL BE CONSTRUED AND GOVERNED ACCORDING TO THE LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS. THE PARTIES HERETO EXPRESSLY AGREE THAT THIS AGREEMENT IS EXECUTED AND SHALL BE PERFORMED IN BEXAR COUNTY, TEXAS, AND VENUE OF ALL DISPUTES, CLAIMS AND LAWSUITS ARISING HEREUNDER SHALL LIE IN BEXAR COUNTY, TEXAS.

**24.    Severability.** If any term or provision of this Agreement is held illegal, invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law; and in lieu of each such illegal, invalid or unenforceable provision, the parties shall use their best efforts to add

PICCS 000115

as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be legal, valid, and enforceable.

**25.** **No Party Deemed Drafter**. The parties have carefully read this entire Agreement. Each party to this Agreement acknowledges that such party has the option to be represented by, or has been represented by, legal counsel in preparation of this Agreement. If this Agreement or any provision hereof is interpreted by an arbitration panel or a court of law, no provision hereof shall be construed more harshly against any party as drafter. Thus, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

**26.** **No Waiver**. The failure of either party to insist in any one or more instances upon the performance of any of the provisions of this Agreement or to pursue its rights hereunder shall not be construed as a waiver of any such provisions or the relinquishment of any such right.

**27.** **Third Party Beneficiaries**. Except as otherwise specifically set forth in this Agreement, it is the intent of the parties that no third party shall be a beneficiary to this Agreement.

**28.** **Conformance with Law**. Each party agrees to carry out all activities undertaken pursuant to this Agreement in conformance with all federal, state, and local laws, rules and regulations, provided however; that nothing contained herein shall prevent either party from initiating legal action to test the validity of any such law, rule, or regulation.

**29.** **Counterparts**. The parties may execute this Agreement in multiple counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same instrument. Physician and Association agree that (i) its signature page may be detached from any one such counterpart and attached to an identical counterpart so that there may be one or more counterparts containing the signature pages of Physician and Association, and (ii) a facsimile or electronic copy of the signature pages shall be deemed original signatures, with any party submitting a document with a facsimile or electronic copy of a signature page agreeing to thereafter submit the page with an original signature to the other. Any party may rely on a facsimile signature as being an ink original.

**30.** **Effective Date**. This Agreement shall be binding and enforceable on the parties as of the Effective Date.

**31.** **Provisions Surviving Termination**. Along with those provisions expressly stated in this Agreement to survive any termination of this Agreement, the following provisions shall also survive any termination of this Agreement: Sections 10-13, 14, 15.3-15.4, 16-17, 20-27, and 31.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date first stated above.

**PHYSICIAN:**

**ASSOCIATION:**
**PEDIATRIC INPATIENT CRITICAL CARE SERVICES, P.A.**

By: _____
      Melvin G. Perry, Jr., M.D.

By: _____
      Hugo Carvajal, M.D., President

PICCS 000116

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date first stated above.

**PHYSICIAN:**

**ASSOCIATION**:
**PEDIATRIC INPATIENT CRITICAL CARE SERVICES, P.A.**

By: _____
Melvin G. Perry, Jr., M.D.

By: _____
Hugo Carvajal, M.D., President

PICCS  000117