# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. MELVIN G. PERRY, JR., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No.  SA-18-CV-404-XR |
| | § | |
| PEDIATRIC INPATIENT CRITICAL | § | |
| CARE SERVICES, P.A., et al., | § | |
| | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered Defendants' Motions for Summary Judgment on the threshold issues of whether Plaintiff had an employment relationship with Defendants for purposes of Title VII.

### Procedural Background

Plaintiff Melvin Perry filed this lawsuit on May 3, 2018 against Defendants Pediatric Inpatient Critical Care Services, P.A. ("PICCS") and VHS San Antonio Partners, LLC d/b/a North Central Baptist Hospital, alleging claims under Title VII and 42 U.S.C. § 1981 for race discrimination. Docket no. 1. Plaintiff filed a First Amended Complaint on December 26, 2018, alleging claims for hostile work environment, discrimination (termination) based on race and/or sex, and retaliation and a claim under § 1981 for race discrimination. Docket no. 28. Plaintiff alleges that PICCS was his employer and that PICCS and VHS were "joint employers" and/or constituted a "single integrated enterprise." *Id*. ¶ 7. Defendants answered and denied employer status. Docket nos. 31, 33.

On June 11, 2019, the Court granted Defendants' motion to bifurcate, allowing limited discovery and the filing of dispositive motions on the threshold issues of whether Plaintiff was an employee or an independent contractor and whether PICCS and VHS were his employers for purposes of Title VII. Defendants have now filed their dispositive motions, and VHS also moves for summary judgment on Plaintiff's § 1981 claim, arguing that there is no contract. Plaintiff has responded in opposition on all issues.

**Factual Background**

Defendant PICCS is a professional association formed under Texas law in December 2014 for the practice of medicine and services ancillary thereto. Docket no. 59-1. PICCS has three directors/owners: Dr. Thomas Gowan, Dr. Hugo Carvajal, and Dr. Nelson Pedro Chavez. PICCS, standing alone, does not employ more than 15 people.

Defendant VHS runs North Central Baptist Hospital ("the Hospital"), and the Hospital maintains a pediatric intensive care unit ("PICU") on its premises. Pediatric intensivists take care of patients in the PICU, and the PICU requires 24/7 physician coverage. The Hospital employs more than 15 people, including nurses and therapists, but does not directly enter into employment relationships with physicians. Waechter depo. at 15, 17.

On or about December 12, 2014, PICCS entered into an Agreement for Pediatric Intensive Care Department Coverage with VHS ("the PICCS-VHS Coverage Agreement") to furnish physicians for full-time coverage to the Hospital's PICU. Docket no. 59-2. PICCS had no other clients and did not provide services to any other Hospital or Hospital System. Chavez depo. at 19. As part of the PICCS-VHS Coverage Agreement, PICCS agreed to provide physicians for the Hospital's PICU "to assure physician coverage of such Services." *Id.* The

Hospital engaged PICCS "on an exclusive basis for [PICCS] to provide to Hospital the Services and supervise the operation of the [PICU] in accordance with" the Agreement.

Each Physician was required to be duly licensed and qualified to practice medicine in Texas (and be Board Certified in Pediatrics or Board eligible), be a participating physician in Medicare and in Texas's Medicaid program, and be approved for membership and/or clinical privileges on the medical staff of the Hospital in accordance with the Hospital's Medical Staff Bylaws and Rules and Regulations. The Bylaws are a form of self-governance, created by the Medical Staff of Baptist Health System. Watkins Decl. They establish standards for Medical Staff membership and Clinical Privileges and provide means to enforce those standards. *Id*. Physicians apply for Medical Staff Membership and Clinical Privileges to admit and treat patients at the Hospital. *Id.* When membership and/or privileges are granted, the physician agrees to abide by the Bylaws and rules and Regulations, as well as the Professional Code of Conduct. *Id.*

PICCS physicians would (1) be the exclusive providers of services in the PICU; (2) provide call coverage for the PICU; (3) administer pediatric procedural sedation to Hospital inpatients and emergency room patients; (4) respond to pediatric emergencies for both inpatients and emergency room patients, when requested by either the attending physician or emergency room physician; (5) attend any and all meetings within the Hospital that Physicians are asked to attend by the Hospital's CEO except to the extent patient care responsibilities necessitates Physician's attention; and (6) perform such other duties as may from time to time be requested by the Hospital, Hospital's Governing Board, Hospital's medical staff, and/or the CEO, and agreed to by PICCS. The Hospital was required to provide written reports of all examinations,

treatments, and procedures performed pursuant to the Agreement for billing and healthcare operations. PICCS warranted that its Physicians would comply with all applicable bylaws, rules, regulations, procedures, and policies of the Hospital and its medical staff.

PICCS would also appoint, subject to the approval of the Hospital CEO, a Physician to serve as Director of the PICU while the Agreement was in effect, and the Director would (1) participate in the educational programs conducted by the Hospital and its medical staff to assure its overall compliance with accreditation and licensing requirements, and perform such other reasonable teaching functions as the Hospital may request; (2) direct non-physician PICU personnel in the performance of professional services for patients; (3) advise the Hospital with respect to the selection, retention, and termination of all personnel who may be required for the proper operation of the PICU, but the Hospital would retain ultimate decision-making authority; (4) establish schedules for all Services provided by Physicians in accordance with the terms of the Agreement; (5) supervise the development and implementation of Hospital quality assurance and quality improvement programs and procedures in the PICU; (6) assist the Hospital in the preparation and conduct of surveys by the Joint Commission and/or any other national, state, or local agency; (7) participate in the Hospital's Medicare Performance Improvement initiatives and other performance management and innovation initiatives; and (8) perform any other duties that Hospital, Hospital's Governing Board, medical staff and/or the CEO may request, as agreed to by the Director. PICCS appointed one of its director/owners, Dr. Chavez, to be the PICU Director.

The Coverage Agreement required PICCS to "cause each Physician who will provide Services under this Agreement to execute the Physician Agreement attached" to the Agreement

as Exhibit A. PICCS would also ensure that each Physician maintained professional liability insurance coverage at specified limits. The Coverage Agreement also contains an Exhibit B outlining the Services that PICCS would provide. It states that "a minimum of 3 full time Physicians will be necessary" and PICCS would "provide Physicians for call coverage in the [PICU] on a 24 hour basis every day during the Term of this Agreement with in-house call coverage provided only when there is a pediatric inpatient in the [PICU] who meets the Critical Care criteria." "On or before the first day of each calendar month, [PICCS] shall provide to the Hospital CEO a schedule of Physicians assigned to provide call coverage in the Department during the calendar month and such schedule shall be posted within the [PICU]."

The Coverage Agreement provides that PICCS and the Physicians it would provide to VHS would be acting as independent contractors of VHS, and would not be considered employees or agents of the Hospital. PICCS warranted to VHS that it would pay compensation to the Physicians based on fair market value and that it would "maintain a written agreement with each physician receiving compensation from [PICCS] that is not an employee of Group (e.g., each non-employed independent contractor), which written agreement is or will be signed by the parties, and does or will specify the services covered by the arrangement." PICCS would bill on the Physicians' behalf, and would have the exclusive right to collections therefrom. VHS agreed to pay PICCS a monthly guaranteed amount of $137,500 (offset by collections). PICCS had "sole responsibility to compensate Physicians, and Director" and reserved the right, in its sole discretion, to determine the compensation payable to each Physician working in the PICU.

The Coverage Agreement further provided that, at all times, "the CEO [of the Hospital] shall have the right to request removal of any such Physician if continued service by such

Physician could jeopardize patient care or safety" and PICCS "agrees to immediately remove any such Physician in accordance with Hospital's Medical Staff Bylaws." Further, the Medical Staff membership and/or clinical privileges of each Physician were "based upon the Medical Staff Bylaws" and "the Medical Staff membership and/or clinical privileges of Director and each Physician at Hospital shall terminate in accordance with the Medical Staff Bylaws"; and 'the Medical Staff Bylaws shall control over this Agreement with respect to peer review."

The Coverage Agreement commenced on March 1, 2015 and was for a three-year term, with automatic extensions on a month-to-month basis for up to six months if not renewed and not advised of a party's intent not to renew. Docket no. 59-2.

PICCS sought physicians to fulfill its obligation to provide coverage to the PICU, and placed an advertisement, to which Perry responded. Docket no. 57-9. PICCS invited Plaintiff to meet with several individuals and groups in January 2015, before contracting with him. Docket no. 59-1. Perry met with several individuals who worked at the Hospital, including the PICU nursing staff and the Hospital President (Bill Waechter), toured the Hospital, and met with Dr. Carvajal and Dr. Gowan. Perry depo. at 23. Perry did not have any further conversations with anyone with the Hospital before contracting with PICCS. Perry depo. at 24.

PICCS eventually contracted services with four physicians: Dr. Perry, Dr. Aviles, Dr. Fernandez, and Dr. Chavez (who was also a shareholder/director of PICCS and was selected as Director of the PICU). Docket no. 59-1 p.36.; Perry depo. at 78. Per the Coverage Agreement, Hospital approval was required for Chavez to be selected as Director.

On March 17, 2015, Dr. Perry entered into a Professional Services Agreement ("PSA") with PICCS. Docket no. 59-3. Plaintiff hired an attorney to negotiate the agreement. The PSA

provides that PICCS "desires to contract with Physician to provide such professional medical services on behalf of Association in accordance with the terms and conditions of the this [*sic*] Agreement." The Agreement was to commence on the first day Perry provided Services under the Agreement after and subject to successful completion of all pre-employment processes, including background review, evidence of professional liability insurance coverage, and credentialing by the Hospital (anticipated to be completed on or around March 30, 2015). In a section entitled "Engagement and Scope of Practice; Relationship Between Parties," the PSA provides,

(a) Physician agrees to provide call coverage services and render professional medical services in the specialty of pediatric critical care medicine exclusively for, except with advance written consent of Association pursuant to Section 7 of this Agreement, and on behalf of Association within the scope of Physician's license at North Central Baptist Hospital in San Antonio, Texas ("NCBH") consistent with the terms and conditions set forth in this Agreement on a schedule as determined by Association (collectively referred to as "Services" under this Agreement). Such Services shall be rendered in a competent, professional and ethical manner, in accordance with prevailing standards of medical practice in the relevant community. Physician shall at all times act and deliver Services in a manner consistent with (i) applicable standards of the Joint Commission and any other relevant accrediting organizations; (ii) all applicable bylaws, rules regulations, procedures, and policies of NCBH and its medical staff; (iii) the Principles of Medical Ethics of the American Medical Association; and (iv) all applicable laws, regulations, rules, orders and directives of any and all applicable governmental and regulatory bodies having competent jurisdiction.

(b) Physician shall comply with the terms of this Agreement and cooperate with North Central Baptist Hospital in carrying out the provision of Services under this Agreement. As required by NCBH and this Agreement, Physician shall i) execute the Physician Agreement attached hereto as Exhibit A and ii) provide to Association a list of Physician's existing directorship or administrative services arrangements, if any; and deliver such Physician Agreement and list of arrangements to Association contemporaneously with the execution of this Agreement. The obligation of Physician to provide and update the list of existing directorship or administrative services  arrangements shall be ongoing while this Agreement is in effect.

(c) Physician agrees to comply with any administrative and clinical policies, rules, and procedures of Association (including, but not limited to, any utilization management, quality improvement program, peer review process, privacy practices, and compliance program), which may be implemented and/or amended in the Association's sole discretion from time to time. Further, Physician agrees to be bound by all of the standards, policies, rules, and regulations adopted or utilized by third party payors from time to time including Medicare and Medicaid ("Payors") which cover his Services.

(d) The relationship between Association and Physician is that of an independent contractor. Physician has no authority to enter into any contract binding Association or to create an obligation on behalf of Association without written authorization from Association. In the performance of the work, duties, and obligations specified in this Agreement, it is understood and agreed by the parties that Physician is at all times acting and performing as an independent contractor to Association. Association shall not withhold taxes, social security, unemployment insurance, workers' compensation, or any other withholding or payment established pursuant to any law or the requirements of any governmental body or make available to Physician any of the benefits afforded to employees of Association. All such payments, withholdings and benefits, if any, are the sole responsibility of Physician and Physician accepts responsibility for the payment of any such compensation for the performance of Services rendered under this Agreement.

Docket no. 59-3. Perry understood that the Agreement stated he was going to be an independent contractor, that he would not get a W-2 or have taxes withheld, and that PICCS would not provide benefits. Perry depo. at 96-97, 100-01. Section 7 states,

7. **Loyalty to Association**. During this Agreement and except to the [extent] written consent is given as stated herein, Physician shall devote Physician's full, entire and undivided professional time and attention to the practice of medicine for Association and in furtherance of Association's best interests. Physician shall not engage in professional work for pay, compensation or other remuneration in Physician's individual capacity or in association with others not employed by Association, nor receive any compensation therefore, without the express written consent of the Board of Directors of Association; however, Section 7 is not intended to require Physician to obtain Association's consent for such activities of Physician during Physician's scheduled time off to include Physician's request to provide his professional services to an urgent care facility located outside of the state of Texas.

*Id.* The parties disagree as to whether section 7 precluded Perry from working anywhere else in Texas during his time off. Perry asserts he could only work in Texas with prior written consent, while PICCS asserts he could work wherever he wanted in his time off. Dr. Gowan states that the caveat was added to address Perry's concerns, but was not needed since he could already work wherever he wanted when he was not scheduled to be in-house or on call at the Hospital. It is undisputed that Perry also worked for various Kids Time Pediatrics locations in Georgia.

The PSA further provides,

> **<u>Physician's Services</u>**. The delivery of professional medical services by a physician requires the exercise of independent medical judgment that is not and cannot be within the right of control of any person or entity other than a licensed physician providing the direct hands on care to a patient. Association and Physician acknowledge that Association does not have the control or the right to control the manner, means, and details of Physician in such regard and shall take no action to do so. Rather, insofar as the healthcare decisions are made in providing medical or surgical services to a patient under this Agreement, Physician shall, at all times, be regarded as acting in his individual capacity as an independent contractor and not as an employee of Association as that term is utilized in Section 301.010 of the Texas Business Organizations Code.

PICCS agreed to pay Perry a fixed annual salary, and Perry was precluded from billing directly any patients or payors for services provided pursuant to the Agreement. PICCS was given exclusive authority to determine the amount and nature of all fees and the procedure for establishing the fees to be charged by patients, and all fees generated from services provided by Perry pursuant to the Agreement belonged to PICCS.

As to benefits, "Physician shall not be entitled to any benefits including those furnished to employees of Association." As to expenses, "Physician may incur ordinary, necessary, and reasonable expenses relating to automobile, auto insurance, cell phone, subscriptions and fees, license and dues, educational expenses, and other similar items. Physician shall carry a cell

phone to facilitate communication between Association and Physician. All of the foregoing expenses shall be borne solely by Physician."

The PSA required Perry to maintain, at his sole expense, a professional liability insurance policy and required Perry to report "adverse actions" to PICCS. The Agreement could be terminated by either PICCS or Perry without cause at any time after the expiration of the first twelve months following the commencement date upon 90-days prior written notice or a shorter period mutually agreed upon. The PSA further automatically terminated upon certain occurrences, such as cancellation of malpractice coverage, "Physician conducts himself in a manner that Association determines in good faith to be unethical, unprofessional, unlawful, or fraudulent, is detrimental to patient care, or impairs the reputation or operations of Association", "Upon NBCH's request in accordance with its Medical Staff Bylaws for the removal of Physician due to not meeting the standard of care for rendering patient care services, or that the health, safety, or welfare of patients could be jeopardized by continued services of Physician," and "Any termination or non-renewal of the Coverage Agreement, or the provision of Physician's services under the Coverage Agreement are suspended, or Physician is otherwise removed from providing services under the Coverage Agreement."

As required by the Coverage Agreement, Dr. Perry signed the Physician Agreement on March 26, 2015. Docket no. 59-3. The Physician Agreement states that the Physician understands he is bound by all terms and conditions of the Coverage Agreement and further states, "In consideration of my approval by Hospital to provide services at North Central Baptist Hospital, pursuant to the Agreement, I knowingly and voluntarily agree" that:

(1) it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an exclusive

provider and, upon expiration or termination of the Coverage Agreement, Hospital shall have the right to grant an exclusive contract to any person or entity; (2) the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges and unless and until such loss of membership occurs, he is bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff; and (3) if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision of Services to any person or entity.

And on September 14, 2015, Dr. Perry signed a "Policy Acknowledgement" from Baptist Health System stating that he received and understands it is his responsibility to read, understand, become familiar with and comply with (1) Medical Staff By-Laws; (2) Medical Staff Rules and Regulations; and (3) Tenet Standards of Conduct. Docket no. 59-11.

PICCS paid Perry an annual salary, paid monthly by direct deposit. Perry depo. at 77. PICCS issued 1099s to Perry for each year he performed services under the PSA. Docket no. 59-1; Docket no. 59-6. No deductions or withholding from his pay were made for taxes, retirement, or other benefits. Perry was responsible for purchasing his own medical/health insurance; PICCS did not provide any medical benefits. Perry depo. at 68. PICCS did not have a leave policy and there was no annual leave provided.

Plaintiff alleges that in October 2016, "Dr. Aviles [of PICCS] joined a group of NCBH nurses in accusing Dr. Perry of racial bias or prejudice in favor of Blacks or African-Americans," and alleges that Dr. Aviles and Dr. Fernandez made racist comments about other African-American co-workers. Docket no. 28 at 8. Plaintiff complained in writing to the Hospital. In November 2016, several nurses threatened to quit if Dr. Perry was not removed from his position at the Hospital. Docket no. 28 at 10. The Hospital states it also received complaints about Plaintiff from patient families. On November 18, 2016, Dr. Kellis (Market Chief Medical

Officer), Dr. Chavez, and Plaintiff met to discuss the complaints received from nursing staff and parents. Dr. Kellis told Plaintiff his behavior must change to ensure patient safety and the Hospital would not tolerate further complaints. On December 6, 2016, Dr. Aviles (of PICCS) wrote a letter expressing concerns and stating she would refuse to work with Plaintiff again if the situation did not improve. On December 20, 2016, the Hospital received a complaint from a pediatric patient's family about Plaintiff.

On January 9, 2017, Dr. Kellis, Dr. Chavez (PICCS, PICU Director), Dr. Gowan (PICCS), and Dr. Carvajal (PICCS) met to discuss Plaintiff and his continued assignment at the Hospital. Dr. Kellis sent an email to Bill Waechter stating, "we reached the decision to tell Dr. Perry that he is being terminated without cause, which invokes a 90 day out clause in the contract (he has to be gone within 90 days), and which also minimizes both our liability." Dr. Gowan states that Perry's conduct met the inappropriate behavior standard in the Medical Staff Rules & Regulations and could jeopardize patient care or safety. Gowan Decl. p. 40-41.

Dr. Gowan states that because the request from the Hospital complied with the medical staff rules & regulations, PICCS terminated Plaintiff's PSA. Gowan Decl. p. 41. Dr. Perry's relationship with PICCS was terminated by Dr. Carvajal (of PICCS) by letter dated January 12, 2017, informing him that the PSA was being terminated by the PICCS Board of Directors, without cause, effective in 90 days. Docket no. 57-6; Docket no. 60-2 (Pl. Ex. 2). Dr. Perry continued to work at the Hospital until about February 28, 2017. Docket no. 57-8. Waechter testified that Perry's staff membership and privileges with the System were revoked by the Medical Staff when he failed to renew his malpractice insurance. Waechter Decl.

## Analysis – Title VII Claims

To establish Title VII liability on the part of a particular defendant, the plaintiff must prove both that the defendant meets Title VII's definition of "employer," *i.e.*, "a person engaged in an industry affecting commerce who has fifteen or more employees," and that an employment relationship existed between him and that defendant. *Muhammad v. Dallas Cty. Cmty. Supervision & Corrs.*, 479 F.3d 377, 380 (5th Cir. 2007). Thus, the Court must follow a two-step inquiry: (1) did the defendant have at least 15 employees during the requisite time period? and, if so, (2) did an employment relationship exist between plaintiff and the defendant? *Id.*

Defendant PICCS moves for summary judgment on Plaintiff's Title VII claims on the following bases: (1) that PICCS is not an "employer" under Title VII because it does not have at least 15 employees and did not during the relevant period (2015 to 2017); (2) Dr. Perry was not an employee of PICCS, but was only an independent contractor; and (3) PICCS and VHS were not joint employers. VHS moves for summary judgment on Plaintiff's Title VII claims on the issue of employee status, arguing that it did not have an employment relationship with Plaintiff as a matter of law and it was not a joint employer.

**Whether PICCS is an employer under Title VII?**

Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b). This is an element of Plaintiff's claim for relief. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006). PICCS provides evidence via the Affidavit of Thomas Gowan that it did not employ 15 or more employees during the relevant time period. PICCS has three

directors/shareholders, contracted with two individuals to do secretarial work, and entered into service agreements with Plaintiff and two other physicians during the relevant time. Even if all of these individuals were employees, they would not meet the 15-employee requirement.

Plaintiff provides no evidence or argument refuting PICCS's assertion that it has not had 15 or more employees during the relevant time period. And Plaintiff does not allege that any other persons were employees of PICCS other than those identified by PICCS in its motion, so as to increase the number above the threshold. In fact, Plaintiff does not even allege in his Complaint that PICCS employed 15 or more people; he alleges only that VHS employed more than 500 employees. Docket no. 28 para 8. Thus, standing alone, PICCS does not meet the statutory definition of "employer" under Title VII because the undisputed summary-judgment evidence is that it did not employ at least 15 employees during the relevant time.

Plaintiff contends that PICCS may nevertheless be liable under Title VII under either a joint employer or single integrated enterprise (also known as "single employer") theory. Plaintiff is seeking to hold PICCS liable as an employer by aggregating PICCS's employees with those of Defendant VHS, which does employ more than 15 people. Docket no. 28 para. 7.  A single employer situation exists where two nominally separate entities are actually part of a single integrated enterprise (*e.g.*, parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management), whereas in a joint employer relationship, separate legal entities handle certain aspects of an employer-employee relationship jointly. *Arculeo v. On-Site Sales & Mktg., L.L.C.*, 425 F.3d 193, 198 (2d Cir. 2005) (quotation marks and citations omitted). "The joint employer doctrine has been applied to temporary employment or staffing agencies and their client entities; it has also been applied to contractors

and subcontractors and other scenarios where two separate entities have control over an employee's employment." *Daniel v. T&M Protection Resources, Inc.*, 992 F. Supp. 2d 302, 314 (S.D.N.Y. 2014). The Second Circuit described the difference between the two tests in *Engelhardt v. S.P. Richards Co., Inc.*, 472 F.3d 1, 4 n.2 (2d Cir. 2006):

> The difference between the "joint employer" and the "integrated employer" tests turns on whether the plaintiff seeks to impose liability on her legal employer or another entity. Compare 29 C.F.R. § 825.106 with § 825.104(c)(2). The former [joint employer] looks to whether there are sufficient indicia of an employer/employee relationship to justify imposing liability on the plaintiff's non-legal employer. The latter [single integrated enterprise] applies where, as here, liability is sought to be imposed on the legal employer by arguing that another entity is sufficiently related such that its actions, or in this case, size, can be attributable to the legal employer.

In *Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761 (5th Cir. 1997), the Fifth Circuit held that "the hybrid test should be used as an initial inquiry to resolve, if need be, whether a plaintiff is an employee of the defendant (or one of the defendants, in a multi defendant case) for the purposes of Title VII" and "[i]f the plaintiff is found to be an employee of one of the defendants under the hybrid test, but questions remain whether a second (or additional) defendant is sufficiently connected to the employer-defendant so as to be considered a single employer, a *Trevino* analysis should be conducted." *Id.* at 764. The law is settled that, under the single integrated enterprise doctrine, where one putative employer does not meet the statutory numerosity requirement, it may nevertheless be liable under Title VII if it is part of a single integrated enterprise with another entity if their combined employees exceed the minimum. Numerous cases allow aggregation under a single integrated enterprise (single employer) theory as set forth in *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) to expose to liability an entity who does not meet the numerosity requirement alone. *See, e.g.*,

*Guillory v. Rainbow Chrysler Dodge Jeep, LLC*, 158 F. App'x 536 (5th Cir. 2005) (applying *Trevino* single employer test to determine whether to aggregate one entity's employee with employees of another for purposes of Title VII); *Badii v. Rick's Cabaret Int'l, Inc.*, No. 3:12-CV-4541-B, 2013 WL 12124034, at *6 (N.D. Tex. June 16, 2013) ("[T]he *Trevino* test has been utilized to aggregate the number of employees of multiple entities for the determination of whether an employer meets the statutory definition under Title VII.").

Unlike the single integrated enterprise doctrine, not all employees of two joint employers are aggregated for purposes of Title VII's numerosity requirement. Plaintiff misreads the EEOC Compliance Manual to argue that all employees of VHS can be attributed to PICCS. The Manual states, "To determine whether a respondent is covered, count the number of individuals employed by the respondent alone and the employees jointly employed by the respondent and other entities." EEOC Compliance Manual § 2–III(B)(1)(a) (iii)(b). It does not state that all employees of both alleged joint employers may be counted. Rather, employees for which a defendant is a joint employer may be counted in addition to the defendant's regular employees to reach the numerosity requirement, or a court may find that the two defendants jointly employ more than fifteen individuals. *See Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) ("A joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another who are jointly employed by the first, but such joint undertaking does not furnish logical justification for adding together all the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other."); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994) (joint employers together jointly employed

more than fifteen employees). Thus, in order to hold PICCS liable under Title VII, Plaintiff must show that he was an employee of PICCS and that PICCS and the Hospital/VHS were a single integrated enterprise.

**Whether Perry was an employee of PICCS?**

To determine whether a person is an employee versus an independent contractor, the controlling standard is the "hybrid economic realities/common law control test." *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013). The economic-realities portion of the test asks whether a putative employee, as a matter of economic reality, is dependent upon the business to which he renders service or is in business for himself. *Id.* at 434. This includes whether the worker's opportunity for profit or loss is determined by the alleged employer and whether the worker worked exclusively for the alleged employer, as well as "whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Muhammad*, 479 F.3d at 380.

The common-law control portion of the test, which courts should emphasize over the economic realities portion, assesses "the extent to which the one for whom the work is being done has the right to control the details and means by which the work is to be performed." *Juino*, 717 F.3d at 434. When examining the control component, courts have focused on whether the alleged employer has the right to hire, fire, supervise, and set the work schedule of the employee. *Muhammad*, 479 F.3d at 380. The Fifth Circuit has stated that the following factors are also pertinent to the analysis:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work;

(4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated [,] i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"[,] (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Id.* at 434-35. The "hybrid economic realities/common law control test" is necessarily a fact-specific inquiry. *Muhammad*, 479 F.3d at 383.

Viewing the facts in the light most favorable to Perry, the Court cannot conclude that Perry was an independent contractor as a matter of law. The economic realities cut both ways. Perry was required to devote full-time work to PICCS, and it is disputed whether he was permitted to work at other places in Texas during his time off. PICCS was Perry's primary source of income, and his relationship with PICCS (the requirement to work for PICCS full-time and PICCS having the exclusive right to charge and bill his patients at the Hospital) significantly limited his other opportunities for profit. In addition, PICCS paid Perry an annual salary, paid monthly by direct deposit, and Perry was not paid by the job. Perry depo. at 77. PICCS billed the patients for services provided by Perry at the Hospital, and Perry was prohibited from billing patients or from determining the amount and nature of all fees. Thus, Perry had no opportunities to increase his profits or income by working more hours or increasing billing rates at the Hospital. These factors weigh in favor of employment status. However, other factors, such as the fact that no benefits were provided, no leave was accrued, no taxes were withheld, Perry paid for his own insurance, licensing, and education costs, PICCS issued 1099s to Perry for each year he worked, and the agreement for an independent contractor arrangement

weigh in favor of independent contractor status.[1] Perry has provided sufficient evidence to raise a fact issue as to whether, as a matter of economic reality, he was an employee of PICCS.

As to the control factors, PICCS had discretion to "hire" by contracting with qualified pediatric physicians who met the criteria in the Coverage Agreement and Medical Staff Bylaws. PICCS decided with whom it would contract as a Physician to provide services under the Coverage Agreement with VHS. PICCS says it had no right to control Plaintiff's termination because termination was governed by the PSA and the Coverage Agreement, which triggered the Medical Staff Bylaws. PICCS asserts that because Plaintiff violated the Bylaws and refused to modify his behavior despite numerous opportunities, Bill Waechter, the Hospital's President, was required to request his removal, and PICCS exercised its right under the Agreement to terminate its contractual relationship with Plaintiff. But whether PICCS felt contractually constrained to terminate the PSA overlooks the other ways in which PICCS had the ability to "fire" Plaintiff by terminating the PSA with or without cause, which would simultaneously terminate Plaintiff's work at the Hospital, since PICCS was the exclusive provider of PICU physicians at the Hospital.

---

[1] Plaintiff submits a letter from the IRS dated June 25, 2018 concerning IRS Form SS-8, "Determination of Worker Status for Purposes of Federal Employment Taxes and Income Tax Withholding," in which the IRS determined, based on information provided by Plaintiff, that he was an employee of PICCS for federal tax purposes. Docket no. 60-2. Defendants' objection to Plaintiff's use of the IRS Form SS-8 because it is not authenticated lacks merit. Since the 2010 amendment to Rule 56, "[a]t the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original) (quoting FED. R. CIV. P. 56(c)(2)). Thus, "evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017). In detailing how Plaintiff should have authenticated the Form, Defendants essentially concede that the Form could be authenticated. Thus, this objection is overruled. However, the Court agrees that the Form is only applicable to PICCS, as it does not make a determination as to VHS. Further, because the Court finds that fact issues remain even without considering the form, the objections that the Form is incomplete, misleading, untrustworthy, and contains hearsay are dismissed as moot.

As to control of Perry's schedule, the relevant contracts granted control of Plaintiff's work schedule to PICCS. The PSA states, "Physician agrees to provide call coverage services and render professional medical services in the specialty of pediatric critical care medicine exclusively for . . . and on behalf of PICCS within the scope of Physician's license at [the Hospital] . . . *on a schedule as determined by [PICCS].*" (Emphasis added.) The Coverage Agreement provided that the Director of the PICU (PICCS-appointed, VHS-approved Dr. Chavez) would establish schedules for all services provided by Physicians in accordance with the terms of the Agreement. The Coverage Agreement further provided that, on or before the first of the month, PICCS would provide to the Hospital CEO a schedule of Physicians arranged to provide call coverage during the calendar month. Consistent with the relevant contracts, Perry testified that Chavez set the work schedule. Perry depo. at 57, 73, 110.

PICCS contends that it did not unilaterally control Plaintiff's schedule, but instead the PICCS Physicians worked cooperatively to set the schedule. Dr. Chavez testified, "We get together, and we select the way to do the schedule, and then we try to attach to it as much as possible." *Id.* at 61. Chavez testified that changes to the schedule were agreed upon. *Id.* at 63. PICCS further contends that Perry had significant control over his own schedule, demonstrated by the fact that he traveled extensively during his contract term, including taking a trip to Australia. Docket no. 58 at 24 & n.14; Perry depo. at 74 (Australia trip). But Perry testified that Chavez had issued a schedule on a 12-week cycle, and he was able to plan his trips around his scheduled shifts and rarely needed to change the schedule. Perry depo. at 74, 91-92. However, Perry was able to reject the proposed schedule that conflicted with his Australia trip, and took the trip without issue, and was able to get enough days (though not all he wanted) for a

conference in Hawaii. Perry depo. at 74. Perry further contends that PICCS controlled where he could work in his time off from the Hospital, since under his interpretation of the PSA he could not work anywhere else in Texas without prior approval. Perry depo. at 76, 89. The parties agree that Plaintiff could work for, and did work for, Georgia Kids Time Pediatrics locations when not on call. Perry depo. at 76; PICCS Ex. O; PICCS Ex. P.[2] PICCS contends that "the intent of the parties was for Plaintiff to be at the [PICU] when he scheduled himself to provide services and not servicing any other entity (medical or not) during those service times contemporaneously; however, Plaintiff was free to do what he wanted (whether work another job – medical or not, or otherwise) during the hours he was not scheduled to perform services under the Agreement." Docket no. 58 at 10. Material fact issues remain concerning the extent to which PICCS controlled Plaintiff's schedule at the Hospital and constrained Plaintiff's ability to work at other locations in Texas during his time off from the Hospital.

Concerning the right to supervise, PICCS and Perry agreed that PICCS does not control or have the right to control the manner, means, and details of his work with regard to healthcare and would take no action to do so. They further agreed that "Physician controls the quality and manner in which Physician's Services are rendered to patients." PICCS asserts that medical specialists usually work without supervision, and Plaintiff confirmed he did not need the assistance of other physicians to do his work. Perry depo. at 80. Perry testified that Dr. Chavez always supported his independent decisionmaking as a physician and let him make the final decision on his patients, and he was the only one making decisions on his medical license. Perry depo. at 105. The fact that Plaintiff is a highly skilled medical specialist who typically works

---

[2] The evidence indicates that Perry maintained his primary residence in Georgia, and traveled to Texas when he was on-call at the Hospital. Perry depo. at 94.

without supervision and exercises independent professional judgment weighs against employment and in favor of independent contractor status.

While Perry exercised independent medical judgment and controlled the manner and means of caring for his patients without supervision, he was required to submit to certain supervision from PICCS. He agreed to "comply with any administrative and clinical policies, rules, and procedures of [PICCS] (including, but not limited to, any utilization management, quality improvement program, peer review process, privacy practices, and compliance program), which may be implemented and/or amended in [PICCS's] sole discretion." In addition, Perry agreed to monitoring for quality assurance and risk prevention programs instituted by PICCS. However, it was made clear that "[n]othing in this Agreement including Physician's participation in the Program shall be construed to interfere with or in any way affect Physician's obligation as a licensed physician to exercise his independent professional medical judgment when rendering health care services to patients."

Perry was required to maintain a cell phone to facilitate communication with PICCS, at his expense. Perry was also required to report adverse actions to PICCS. Plaintiff further contends that PICCS exerted control by providing certain criteria to Dr. Perry through Dr. Chavez, without discussion, that he had to follow, requiring that certain medicines be used, requiring him to get medical malpractice insurance from a particular provider, and requiring him to accept all patients. Depo at 17, 19, 41-42, 62-63, 113-14. PICCS disputes these assertions, stating that Perry ignored some of these supposed examples of control, showing  his independence, and that some of these were regulatory safety requirements that were not imposed

by PICCS but by federal law (*e.g*., the Emergency Medical Treatment & Labor Act of 1986). Material fact issues exist concerning the extent to which PICCS supervised Plaintiff.

The case law demonstrates that the conclusion of whether a worker is an employee or independent contractor is highly fact specific, and here material fact issues concerning some of the underlying facts preclude summary judgment on the issue of whether Plaintiff had an employment relationship with PICCS. Thus, the Court must determine whether PICCS and VHS are a single business enterprise.

**Whether PICCS and VHS are a single integrated enterprise (single employer)?**

According to the EEOC Compliance Manual, "If an employer does not have the minimum number of employees to meet the statutory requirement, it is still covered if it is part of an 'integrated enterprise' that, overall, meets the requirement. An integrated enterprise is one in which the operations of two or more employers are considered so intertwined that they can be considered the single employer of the charging party. The separate entities that form an integrated enterprise are treated as a single employer for purposes of both coverage and liability." EEOC Compliance Manual 2-III B1(a) iii(a). According to the Manual, the following factors are relevant to the issue of centralized control of labor relations: Whether there is a centralized source of authority where personnel policy is developed and implemented. Whether one entity maintains personnel records and screens and tests applicants for employment. Whether the entities share a personnel department and whether inter-company transfers and promotions of personnel are common. Whether the same persons make the employment decisions for both entities.

The Fifth Circuit set forth the applicable test for single integrated enterprises in *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983). Factors considered in determining whether distinct entities constitute an integrated enterprise are (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control, with centralized control of labor relations being the most important factor. *Id.* at 404. This criterion has been further refined to the point that "[t]he critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id.*

Defendants argue that the single employer test is limited to parent-subsidiary situations and does not apply here. Defendants argue that, when service contracts are involved, courts apply the joint employer test, not the single integrated enterprise test. Docket no. 66 at 16 (citing *EEOC v. Valero Refining-Tex. L.P.*, Civil Action no. 3:10-CV-398, 2013 WL 1168620, at *3 (S.D. Tex. 2013 Mar. 13, 2013) ("[T]he 'integrated-enterprise test is not a good fit for a case involving one company with a service contract with the other, as opposed to affiliated or related companies such as a parent and subsidiary'"). But the EEOC Compliance Manual states that "while this issue often arises where there is a parent-subsidiary relationship, a parent-subsidiary relationship is not required for two companies to be considered an integrated enterprise." EEOC Compliance Manual 2-III B1(a) iii(a). The *Trevino* case establishing the single integrated enterprise standard involved a worker employed by ABI, which provided maintenance and operating employees to Celanese, not a parent-subsidiary relationship. And in fact, this Court

has previously applied the *Trevino* test in a similar factual scenario. *Johnson v. El Paso Pathology Grp., P.A.*, 868 F. Supp. 852 (W.D. Tex. 1994).[3]

In *Johnson*, the plaintiff pathologist contracted with a physician group (which had fewer than 15 employees) and practiced at the System (which had more than 15 employees) and sought to hold both liable. The district court found the requisite control of labor relations because "the [Hospital] System was significantly involved and ultimately controlled the [Physician] Group's employment relations with its physicians." 868 F. Supp. at 860. Under the agreement between the Hospital System and the Physician Group, "the number of physicians retained by the Group was to be determined in consultation with and upon the written consent of the System," "the Group had to obtain the written approval of the System prior to replacing existing physicians or to engaging additional physicians, … the System administered the compensation and benefits for the physicians," and "the Group and the System were a team, making joint decisions." *Id.* By contract and implementation, the System reserved for itself the ultimate decisions regarding physician employment matters for the Group, and was jointly involved in the plaintiff's termination. *Id.* Moreover, the System had complete control over the operations, management,

_____

[3] The Court applied the *Trevino* test, but referred to the defendants as joint employers. Confusingly, "[t]he single-employer test is often referred to as the . . . joint-employer test." *Patterson v. Yazoo City, Mss.*, 847 F. Supp. 2d 924, 932 n.20 (S.D. Miss. 2012). However, though sometimes muddled or conflated, the single integrated enterprise (single employer) theory and the joint employer theory of liability are generally recognized as distinct theories by the Fifth Circuit and other courts. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (affirming summary judgment on single employer theory and finding joint employer theory waived, but also lacking merit because the plaintiff made no showing that the alleged joint employer "retained for itself sufficient control of the terms and conditions of [plaintiff's] employment"); *National Labor Relations Board v. Browning-Ferris Industrs. of Penn., Inc.*, 691 F.2d 1117 (3d Cir. 1982) ("The 'joint employer' and 'single employer' concepts are distinct. Admittedly, there has been a blurring of these concepts at times by some courts and by the Board. However, as the Supreme Court itself has recognized, the two concepts approach the issue of 'who is the employer,' from two different viewpoints. As such, different standards are required for each-that enunciated in *Radio Union v. Broadcast Service of Mobile, Inc*., *supra*, to apply in the 'single employer' context and that set out in *Boire v. Greyhound Corp*., *supra*, to apply in the 'joint employer' context.").

and finances of the Physician Group. *Id.* The district court found the fact situation suited to an analysis under *Trevino*, and further found that, under the *Trevino* factors, the defendants were the single employer of the plaintiff. The scenario in *Johnson*, however, involves a much higher level of integrated control of labor relations than is present in this case.

In *Schweitzer*, 104 F.3d at 765, the Fifth Circuit also emphasized that we must focus on the control of the second company over the employment decisions of the first company, stating that evidence "central to finding a single employer relationship" would be "involvement in the daily employment decisions" of the first company. In *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997), it stated that "[s]ome nexus to the [first company's] daily employment decisions must be shown." The focus is on the core activities regulated by the anti-discrimination laws. *Id.* at 777. In *Trevino*, for example, many workers transferred from ABI to Celanese, Celanese managers and supervisors on numerous occasions authorized lay-offs, recalls, promotions and transfers of ABI employees to Celanese, and the record contained over one hundred personnel documents cataloguing the promotions and pay increases of ABI employees which bore the signatures of various Celanese managers purportedly acting as "General Foreman" or "Foreman" for ABI. 701 F.3d at 400.

In *Lusk*, the Fifth Circuit indicated that "[o]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary—domination similar to that which justifies piercing the corporate veil—is sufficient to rebut this presumption [of limited liability], and to permit an inference that the parent corporation was a final decision-maker in its subsidiary's employment decisions." *Lusk*, 129 F.3d at 778. Further, "The interrelation of operations element of the single employer test ultimately focuses on

whether the parent corporation excessively influenced or interfered with the business operations of its subsidiary, that is, whether the parent actually exercised a degree of control beyond that found in the typical parent-subsidiary relationship." *Id.* "Attention to detail," not general oversight, is the hallmark of interrelated operations. *Id.* Relevant factors suggesting the existence of interrelated operations include evidence that the parent: (1) was involved directly in the subsidiary's daily decisions relating to production, distribution, marketing, and advertising; (2) shared employees, services, records, and equipment with the subsidiary; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) maintained the subsidiary's books; (5) issued the subsidiary's paychecks; or (6) prepared and filed the subsidiary's tax returns. *Id.*

There is no such evidence of the type found in *Trevino* or discussed in *Lusk* in this case. Plaintiff's assertion that the fact that Dana Kellis and Bill Waechter of VHS made the decision to terminate Plaintiff's contract together with PICCS "shows the first three factors of the single enterprise" test is incorrect. Nevertheless, Plaintiff contends that he shows a single integrated enterprise based on the fact that VHS and PICCS jointly decided to terminate Perry, that VHS Medical Staff Services had the power to discipline physicians, as well as the Hospital's retaining substantial involvement and supervisory authority over the people who worked for PICCS, including (1) being given approval over who could be selected as the Director of the PICU and requiring that the Director work exclusively for the Hospital, (2) requiring the PICCS physicians to be able to perform certain services, have certain qualifications, and submit certain records to the Hospital, which then became the exclusive property of the Hospital; (3) requiring PICCS to pay physicians "fair market value," (4) requiring PICCS physicians to be subject to all rules,

regulations, and policies of the Hospital, and (5) retaining power and authority to demand that any PICCS physician be removed, with which PICCS had to comply. Docket no. 60 at 6. Further, it appears that the Hospital had some involvement in determining that a "a minimum of 3 full time Physicians will be necessary." Coverage Agreement Ex. B.

Although close, Fifth Circuit cases indicate the test is not met here. And most cases applying the single integrated employer test in other circuits have found that the test was not met. *Grace v.* USCAR, 521 F.3d 655, 664 (6th Cir. 2008) ("[O]ther circuits that have addressed the issue have generally found that the test was not met."). The Court finds that, even taken in the light most favorable to Plaintiff, he fails to show the requisite degree of interrelation in daily employment matters required for a single business enterprise. Although the Hospital retained the right to request Plaintiff's removal, and exercised that right, there is simply insufficient evidence for a reasonable factfinder to conclude that the Hospital was "so involved in the daily employment decisions of [PICCS] as to justify treating the two [entities] as a single employer."

Thus, Plaintiff cannot treat PICCS and VHS as a single employer, and cannot attribute VHS's employees to PICCS. Because they are not a single integrated enterprise, as a matter of law, PICCS does not have sufficient employees and is therefore not an employer for purposes of Title VII. However, questions remain whether PICCS and VHS were nevertheless joint employers of Perry and thus whether VHS can be liable as a joint employer even though PICCS is not an employer.

**Whether VHS retained sufficient control to be considered Perry's joint employer?**

Plaintiff contends that VHS is his joint employer, relying on *Burton v Freescale Semiconductor, Inc.*, 798 F.3d 222 (5th Cir. 2015), in which the Fifth Circuit analyzed whether

a client agency employed a worker supplied by a temporary staffing agency using the hybrid control test. In *Burton*, the plaintiff worked for Freescale as a "temp" employee provided by Manpower. The Fifth Circuit found adequate evidence of an employment relationship where the control factors showed that (1) Freescale had the right to demand the plaintiff's termination from the assignment, (2) Freescale supervised her, (3) complaints against her were made by Freescale personnel, (4) her nominal Manpower supervisor worked primarily at a different Freescale location and never observed her while she worked, (5) Freescale employees delivered on-the-job corrections and admonishments, and (6) Freescale decided and insisted that the plaintiff be fired. *Id.* at 227. Thus, even though the economic realities inquiry favored Freescale insofar as it did not handle payroll, withhold taxes, provide benefits, or set the terms and conditions of employment for Manpower temps, the common-law control test was dispositive. *Id.* at 227-28.

Freescale involves the common situation where a staffing agency who employs the plaintiff provides the employee to a client, who is found to be a joint employer. EEOC regulations for the FMLA state, "[J]oint employment will ordinarily be found to exist when a temporary placement agency supplies employees to a second employer." 29 C.F.R. § 825.106. Other circuit courts have also held that workers provided by staffing companies are employees of the client when the client supervises their daily work. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 218-19 & n.10 (3d Cir. 2015) (citing cases from the Fourth Circuit). In those cases, it is not a question whether the plaintiff is an employee or independent contractor; the question is whether the plaintiff, who is clearly an employee of the staffing agency, is also an employee of the client agency.

In this case, however, Defendants argue that Perry is an independent contractor and that PICCS does not concede that it is his employer, and note that numerous courts have held that physicians with staff privileges at hospitals are not employees despite the hospital's exercise of some control to maintain standards of patient care and record keeping. As noted by the Fourth Circuit, this control exists for both employee doctors and for doctors merely enjoying practice privileges at a facility and is necessitated by the hospitals' need to avoid liability, and is thus not a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital. *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997). The Fifth Circuit has held, "physician staff privileges, as a matter of law, do not create an employer-employee relationship for the purpose of maintaining an action under title VII." *Aziz v. Uvalde Cty. Hosp. Auth.*, 990 F.2d 626, at *2 (5th Cir. 1993) (unpublished). And courts have held that an on-call arrangement between a physician and a hospital does not render the doctor an employee. *Henry v. Adventist Health Castle Med. Ctr.*, 363 F. Supp. 3d 1128, 1134 (D. Haw. 2019) (citing *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996)). "This is not a case in which [the Hospital] merely leased [physicians] from [PICCCS] and then treated them as its own employees." *Clinton's Ditch Co-op Co., Inc. v. N.L.R.B.*, 778 F.2d 132, 140 (2d Cir. 1985). Rather, to the extent control was exercised, it was done so by PICCS, and the Hospital treated Perry the same as it treated all physicians with staff privileges.

In *Diggs v. Harris Hospital-Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988), the Fifth Circuit considered whether a physician given staff privileges at a hospital had an employment relationship with the hospital. While the hospital supplied the tools, staff, and equipment utilized by the physician in delivering medical care at the hospital, and while it imposed standards upon

those permitted to hold staff privileges, the hospital did not direct the manner or means by which the physician rendered medical care. The physician plaintiff treated her patients without direct supervision, and though she was required to have a sponsor present during surgical procedures, this was to have someone attest to her essential qualifications rather than directing the details of her work. The hospital was not under a duty to admit her patients and did not pay her for her services. The hospital did not provide salary or wages to physicians with staff privileges, nor did it pay their licensing fees, professional dues, insurances, taxes, or retirement benefits. Thus, there was not an employer-employee relationship.

VHS notes that, consistent with *Diggs*, other courts have consistently held that independent physicians with practice privileges at hospitals are not employees of the hospital. *See, e.g.*, *Levitin v. Nw. Commty Hosp.*, 923 F.3d 499 (7th Cir. 2019) (finding no employment relationship using the "economic realities of the relationship and the degree of control the employer exercises over the alleged employee" test). In *Levitin*, the plaintiff owned her own medical practice, billed her patients directly, and filed taxes as a self-employed physician, and the hospital did not provide employment benefits or pay her licensing dues. Moreover, she set her own hours, subject only to operating-room availability; she could obtain practice privileges at other hospitals and redirect her patients to those locations; and she could use her own staff in surgeries; "most importantly, she made the treatment decisions for her patients." *Id.* at 501-02. The restrictions placed on her by the hospital – on-call demands, medical-education standards, peer-review processes, and reporting requirements – were insufficient to create an employment relationship. *Id.* at 502.

It is true that those cases did not involve a doctor provided to work on a full-time basis to the hospital by a physician group who had entered into a contractual relationship with the hospital to be an exclusive provider, as is the case here. *See Johnson v. El Paso Pathology Grp., P.A.*, 868 F. Supp. 852, 861 (W.D. Tex. 1994) (noting that the plaintiff in *Diggs* was not provided through an association or group performing exclusive services under contract with the hospital and could not go to other hospitals to earn a living because other hospitals also had exclusive providers of pathology services). However, those cases are not materially different when looking at the degree of control exercised by the hospitals over the physicians.

Regardless of whether the physician is an independent physician or part of a physicians group providing exclusive services to the Hospital, the requirement to comply with detailed hospital regulations and use of Hospital facilities does not indicate an employment relationship because all doctors, whether employees or simply those with privileges at the Hospital, must do so. As the Fourth Circuit reasoned,

> While Cilecek certainly retained a professional independence in performing professional services, he also shared a professional responsibility to cooperate with the hospitals to maintain standards of patient care, to keep appropriate records, and to follow established procedures. This shared control exists both for employee doctors and for doctors merely enjoying practice privileges at a facility. If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability. Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.

> Similarly, that Cilecek used instruments of the hospital emergency room that were supplied by the hospital is also inherent in the provision of emergency medical services and likewise is not a reliable indicator of employee status. Whether a doctor specializing in emergency medicine is an employee of the hospital or simply has privileges at the hospital, he must, in almost every case,

use emergency room facilities provided by the hospital in order to render his services.

*Cilecek*, 115 F.3d at 262.

In *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799 (7th Cir. 1999), the plaintiff anesthesiologist was appointed to the medical staff of the Hospital (*i.e.*, given privileges), and was reappointed each year and her privileges increased. After her hospital privileges were terminated, the plaintiff sued the Hospital under Title VII and the ADEA. The Seventh Circuit concluded she was not an employee because, although she could not associate herself with other hospitals, she was treated as self-employed for tax purposes, paid her own malpractice insurance, and received no benefits from the Hospital. The governing agreement for anesthesiology department services also referred to anesthesiologists as independent contractors, not employees. The plaintiff did not point to evidence that the Hospital exercised "close control."

In *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002), the Seventh Circuit considered claims brought by a physician against her former employer Addus, a health care provider that contracted with the state Department of Corrections ("DOC"), and the court held she was not an employee of the DOC. Addus contracted with the DOC to supply health care services to inmates, and Hojnacki worked as medical director at a correctional facility. After Hojnacki provided a 7-Up to an inmate in violation of prison policies, the Warden sent a letter to Addus relating that Hojnacki had knowingly violated prison policies and recommending that appropriate disciplinary action be taken that would disallow her entrance into the correctional facility. Addus then discharged her because she was no longer allowed access to the correctional facility and no other similar positions existed within the company. The court found that the

three-year duration of her employment through three health care provider contractors suggested an employment relationship, the kind of occupation and skill required and the source of payment and benefits tended to show she was not an employee of DOC, and the source of equipment supplies/maintenance of workplace/costs of operation was inconclusive.

Because control is the most important factor, the DOC's lack of control over the performance of Dr. Hojnacki's duties suggested she was not an employee. She was not supervised in her work by the DOC, and the manual setting out the policies and procedures of the health care unit provided that "[a]ll medical, psychiatric and dental matters involving clinical judgment are the sole province of the physician or dentist responsible for the care of inmates." Her duties, implementing "all clinical aspects of the health care program" and providing "primary health care services" would undoubtedly involve "clinical judgment" and would therefore be the "sole province" of Dr. Hojnacki.

Dr. Hojnacki argued that the DOC controlled her work through the various policies and procedures with which the DOC required her to comply, such as (1) completing some unspecified training, (2) serving on a quality improvement committee with specified duties and reporting to the warden, (3) requiring her to perform a monthly review of mortality cases, (4) specifying what information should be included in admission and discharge forms, (5) specifying how often to perform physical exams of prisoners, and (6) specifying what kind of questions to ask the inmates and to observe an inmate's behavior, appearance, and mental status. She also argued that the DOC controlled her by setting her working hours and requiring her to be on call. The court found that these constraints did not amount to control of the details of her performance and were not "the discretionary control an employer daily exercises over its

employees' conduct." *Id.* at 551-52. The court thus found Dr. Hojnacki was not an employee or a loaned employee.

With these examples in mind, the Court turns to the allegations in the present case. As in *Burton v. Freescale*, the economic realities weigh in favor of finding that the Hospital was not an employer: it did not pay Plaintiff's salary, withhold taxes, or provide benefits, or reimburse expenses, nor did it set the specific terms and conditions of Plaintiff's employment. Under the Coverage Agreement, VHS did require that PICCS Physicians be paid fair market value, but otherwise PICCS retained sole discretion in setting their compensation. PICCS set the rates for Plaintiff's work, handled all the billing for Plaintiff's work, and paid Plaintiff for his work; VHS did not.

For control, we look at whether (1) the alleged employer has the right to hire and fire the employee, (2) the right to supervise the employee, and (3) the right to set the employee's work schedule. VHS contends that the contractual agreement (PSA) governing the terms of Plaintiff's service at the Hospital was negotiated between and entered into by PICCS and Plaintiff. Waechter Decl. Perry argues that VHS "had the power to prevent [his] hiring" by requiring him to sign the Physician Agreement as a requirement of the PICCS-VHS Coverage Agreement. The Physician Agreement does not address the substantive terms and conditions of Plaintiff's work at the Hospital. Requiring Plaintiff and all Physicians who contract with PICCS to make acknowledgments through the Coverage Agreement is not the same as exercising hiring control. And Waechter (President of the Hospital and signatory to the Coverage Agreement) testified that, to the extent it referred to "approval" to provide services, it meant only credentialing and granting of staff privileges, not approval of PICCS's hiring decision. Waechter depo. at 24. VHS

would accept whatever qualified Physicians (per the terms of the Coverage Agreement) that PICCS selected and provided to work in the PICU (other than the Director).

Plaintiff contends that VHS employees, including President Waechter, interviewed him. Perry depo. at 17. VHS asserts that Plaintiff was given a tour of the Hospital, met with Bill Waechter, and had breakfast with the PICU nursing staff, wherein they discussed Plaintiff's preferences for being contacted while on call and his philosophy concerning recommendations from the nursing staff. PICCS contends this was only an informal attempt "to ascertain whether Dr. Perry could work well with the staff" and there was no formal evaluation or formal interview process. Docket no. 59-1 (Gowan Decl.); Gowan depo. at 21 (Waechter interviewed Plaintiff, but it was so the candidate would know he could talk to the Hospital CEO, and it was more of an introduction, not an assessment); Gowan Decl. p. 33 ("The purpose was to see if he would be compatible to work with the staff at North Central Baptist Hospital."). Waechter testified he did not recall interviewing Perry or even meeting with him, but that he likes to say "hi" and give a history of the hospital and information such as where to park. Waechter depo. at 66. Thus, there is no evidence that VHS played a significant role in hiring Plaintiff or that its approval was required for PICCS to hire him.

VHS did reserve the right for its CEO to request the removal of a PICCS physician from the Hospital if continued service by such physician could jeopardize patient care or safety, and PICCS agreed to immediately remove any such Physician in accordance with the Bylaws. Chavez testified that he insisted on the limitations that the request could only be for a reason contained within the Bylaws. Chavez depo. at 34-35. And VHS agrees that its right was limited to the "rare instance" of VHS concluding that continued service by a PICCS physician could

jeopardize patient care or safety. VHS asserts that Waechter and Kellis felt that Plaintiff had created a hostile, non-workable environment that was placing patient care in jeopardy. VHS did not exercise its right to request removal as to any other PICCS Physician. VHS notes that its request did not preclude Plaintiff from admitting or treating patients at North Central Baptist or any other hospital in the Baptist Health System because Plaintiff continued to hold his Medical Staff membership and privileges (which can only be terminated in accordance with the Medical Staff Bylaws), and those were automatically revoked later only because Plaintiff failed to maintain his medical malpractice insurance.

In *Jones v. Norfolk Southern Co.*, 348 F. App'x 970, at *3 (5th Cir. 2009), the Fifth Circuit noted in an unpublished opinion that an alleged joint employer's absolute right to bar the staffing company's employees from the facility if, in its sole judgment, the employee posed a risk or threat to the safe and efficient operation of the facility was insufficient to transform it into an employer. Further, in *E.E.O.C. v. Valerio Refining-Texas, L.P.*, No. 3:10-CV-398, 2013 WL 1168620, at *4 (S.D. Tex. Mar. 13, 2013), the district court considered the EEOC's position that because Valero made the decision to exclude the subcontractor's employee from the refinery, and the subcontractor had no other work for him and he lost his job as a result, that Valero effectively fired him. The district court wrote,

> But the Fifth Circuit recently rejected the argument that the power of a company to exclude an independent contractor's employees from its premises renders it a joint employer. *See Jones* [*v. Norfolk S. Co.*], 348 F. App'x at 973 ("Norfolk's 'power' over TVM employees was limited to barring TVM employees from the Norfolk facility. This 'power' is insufficient to transform Norfolk into Jones's employer for Title VII purposes."). So did a recent, factually similar district court case, in which a plaintiff hired by an independent contractor to perform work at an Exxon Mobil chemical plant was excluded from the plant after she was discovered with contraband. *See Boutin* [*v. Exxon Mobil Corp.*], 730 F.Supp.2d

> [660,] 667, 680–81 [S.D. Tex. 2010] (declining to find that Exxon Mobil was a joint employer based on its authority to exclude the plaintiff from the plant).

*Id.* at *4. Thus, the fact that Valero excluded the plaintiff from its premises, without more, did not amount to the control required; Valero did not have authority to discipline the plaintiff and did not directly supervise him beyond establishing the safety protocols to which he was required to adhere. *Id.* at *4-5. These cases, as well as *Hojnacki* from the Seventh Circuit, discussed *supra*, indicate that the fact that VHS exercised its contractual right to ask for Perry to be removed from the PICU contract does not make VHS his joint employer.

With regard to scheduling control, VHS contends that it did not dictate Plaintiff's work schedule or control when he worked. VHS asserts that PICCS created and maintained the work schedules for its physicians, including Plaintiff, for both on-call coverage and for administering pediatric procedural sedation. VHS states it had no oversight in or involvement in the scheduling process. VHS also did not require any sort of regular attendance by Plaintiff, and Plaintiff sometimes worked just one week a month. Although some VHS employees asked him about extended absences, it was "more of just a curiosity" and not like a "You're in trouble" kind of thing. Perry depo. at 76. VHS did not dictate that Plaintiff could not work at other facilities. Perry depo. at 76.

To demonstrate VHS's control of his schedule, Plaintiff asserts that VHS employee Shannon Herrod scheduled him for pediatric sedations at inappropriate times. Perry depo. at 59-60. Under the Coverage Agreement, PICCS would provide scheduled sedation Monday through Friday from 0700 to 1300 and emergency sedation coverage up to 1500, or as otherwise agreed by the parties in writing. Docket no. 59-2 at 13. Under the schedule, the night shift doctor was the sedation doctor the next morning, and was not supposed to be there past two, but Perry

complained that Herrod was scheduling sedations too late in the day. Perry depo. at 60. But Dr. Chavez placed Perry on the schedule, including the sedation schedule, with Plaintiff's stated availability, and Herrod merely scheduled patients to be seen as an administrative function. Thus, she was scheduling procedures, not necessarily setting Plaintiff's schedule or procedures. Further, Plaintiff spoke with VHS administration and the process changed so that sedations were more regularly scheduled at times Plaintiff deemed appropriate. Thus, Plaintiff fails to demonstrate that VHS controlled Plaintiff's schedule in this regard.

Plaintiff further asserts that VHS required him to be present at the Hospital at certain times for in-house call coverage. 38. The Coverage Agreement provided that PICCS would provide "in-house call coverage" "only when there is a pediatric inpatient in the Department who meets the Critical Care criteria." Docket no. 59-2 at 12. Physicians were required to be at the Hospital (in-house) during the day per the Coverage Agreement according to Chavez. Perry depo. at 38. Several months after starting (May 9, 2015), Chavez emailed that "we" had developed criteria (Perry thought with the Hospital administration) that required that PICU Physicians stay in-house at night when certain criteria were met, rather than managing the patient remotely. Perry testified, "[T]hey came up with a set of criteria that came to use through PICCS for which we had to stay. There was not an option." Perry depo. at 38, 41. Perry disagreed with the criteria and voiced his disagreement to Chavez, but Chavez said it was part of the agreement that PICCS had with the Hospital and he had no choice but to stay. Perry depo. at 41. Chavez stated it was required by the Society of Critical Care Medicine Guidelines, which state which types of patients should be managed by pediatric intensivists, but Perry believed they did not require physicians to be in-house to manage them. Perry depo. at 43-44. As a result of the

policy, there were at least some instances where Perry had to stay in-house overnight. Perry depo. at 45, 131. This fails to demonstrate that VHS controlled Plaintiff's schedule, however. Requiring Physicians to remain in-house when certain medical criteria were met pursuant to the Coverage Agreement is part of the duties that PICU Physicians must perform pursuant to the Coverage Agreement, regardless of whether Plaintiff agreed or disagreed that the Critical Care criteria required it. *Hojnacki*, 285 F.3d at 551 ("[O]ne can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct."). Further, Plaintiff fails to demonstrate beyond speculation that any change in policy came from VHS rather than PICCS.

With regard to supervision, VHS contends it did not supervise Plaintiff either contractually or as a matter of fact. The contractual provisions provide that the PICU would be supervised by the Director, Dr. Chavez, who was appointed by and is an owner/director of PICCS. The Director had to be approved by VHS, and acted as a liaison between the Hospital, PICCS, and the Physicians. Chavez depo. at 4. Dr. Chavez's duties including supervising the non-Physician staff, but there is nothing in the contract stating he would supervise the Physicians. Chavez testified that if "they [the Hospital] are filing a complaint that the nurses or the doctors were doing this or that, they will communicate to me. And if there's a part that we can fix, then we'll fix it." Chavez depo. at 4-5. Chavez testified that privilege suspensions would be done by the Medical Board pursuant to the Bylaws, not by the Hospital. *Id*. at 28.

VHS did not maintain personnel records or conduct any sort of performance review for Perry. Although Perry was twice peer reviewed for quality of care by the Hospital Medical Staff,

the Medical Staff is its own, independent, self-governing body composed of physicians holding Medical Staff membership and privileges, and is distinct from VHS the Hospital. Peer review is conducted when the activities or professional conduct of any physician is brought into question. Watkins Decl. Peer review assesses whether there were any quality of care of patient safety concerns. *Id*. After an investigation, the Medical Executive Board may issue letters of reprimand or warning, may recommend terms of probation, recommend reduction, suspension or revocation of clinical privileges, recommend that staff membership be suspended or revoked, or take other appropriate actions. Certain scenarios also result in automatic suspension or limitation of privileges or membership, including failure to maintain professional liability insurance. Since both Plaintiff's peer reviews revealed no quality of care issues, there were no consequences from the reviews. *Id.* Courts have held that peer review is not the type of supervision establishing an employment relationship with the Hospital. All medical staff agree to abide by the Medical Staff Bylaws and Rules and Regulations, and they provide a form of self-governance. *Id.*; *see also* Gowan Decl. p.17. The Bylaws incorporate the Medical Staff Rules and Regulations, which govern how a physician must act. Gowan Decl. p. 17.

Plaintiff asserts that VHS supervised him and had the authority to discipline him because the PSA required him to subject himself to the Tenet Standards of Care in addition to the Bylaws, and the Tenet Standards of Care provide that failure to follow Tenet's policies and procedures will result in disciplinary action up to and including termination. The Tenet Standards of Conduct set forth Tenet's core values, such as quality, integrity, service, innovation, and transparency. They state that the standards "define what it means to be a Tenet employee, and you simply cannot work here without committing to them." Docket no. 60-2 at 25. But they also

state that they apply "to contractors when they are acting on behalf of Tenet" and "[m]any of our contractors also are required to sign a certification" that they have read and understood the standards. *Id.* at 26. Requiring all workers to comply with general policies and procedures governing quality, safety, and compliance with regulatory standards does not create an employment relationship.

Perry contends Dr. Kellis, Chief Medical Officer at the Hospital supervised him. Perry's first interaction with Kellis was a few weeks after he hand-delivered his complaint to everyone in 2016. Perry depo. at 46. Kellis called in Drs. Chavez, Fernandez, Aviles, and Perry "to discuss work environment." Perry testified that Kellis said, "Until two weeks ago, I never heard your name before and now I'm getting calls or texts almost daily from the nurses complaining about you. I want it to stop and go back to the way it was when I didn't know who you were . . . basically, you know, I would be terminated or removed or whatever it was, to that effect." Perry depo. at 46. Plaintiff also points to the fact that the Hospital could prohibit him from treating patients, and in fact removed two patients from his care. Perry depo. at 54. Plaintiff testified that there were two instances where parents complained to Figueroa (PICU nursing director), who took the complaints to administration, and then he "had the directive that actually even came to me through the nurses that I was not allowed to take care of those two patients, per the hospital." *Id.* Instead, other doctors would see those patients. But these instances demonstrate only that the Hospital took appropriate steps to protect its relationship with its employee nurses and its customers in order to continue delivery quality care, as it would regarding the conduct of all persons operating or visiting its premises, employees or not.

Perry further contends that the Hospital's CEO Bill Waechter was directly involved in communicating with the nurses about issues involving Plaintiff, and thus supervised him indirectly through the nursing staff. He testified that he did not interact with Waechter very frequently and "had no conversations really with Bill." Perry depo. at 31, 34. Perry testified that Figueroa had a direct line to Waechter, and Waechter frequently communicated directly with the nurses about issues involving him, though he never heard these conversations or other conversations between Waechter and the nurses. Perry depo. at 31, 35. VHS's objection to this testimony as lacking personal knowledge is sustained. Perry testified that Waechter would come through on rounds and sometimes would speak with the staff. Perry depo. at 34. Waechter also once had a pregnant patient transferred to the Hospital over his objection. Perry testified that this was a direct example of forcing a patient on him that he felt was inappropriate because she needed an OB intensivist. *Id*. at 36-37. But these examples do not demonstrate that Waechter supervised Plaintiff or interfered with his medical judgment in a meaningful way.

Perry testified that Figueroa also supervised him by attempting to interfere in medical management of patients, which Perry felt was beyond her education and training. Perry depo. at 35. She investigated his complaints about the staff, even when he asked for her not to because she was inappropriately close with the staff. Perry depo. at 36. But Plaintiff has not credibly demonstrated that Figueroa, a nurse, supervised him or exercised control over him.

Plaintiff also points to a directive from Baptist that the PICCS physicians would have to consult on every patient in the PICU. Perry depo. at 46-48. Perry thought this took away discretion from the admitting physician and the consulting PICU physician. *Id*. Perry stated that the directive came from Chavez, but he said "we are" part of this now, like the other ICUs in

Baptist's system. *Id.* Perry thought he did not need to see the patients based on a directive by people who are not medically trained. *Id.* Again, this does not demonstrate any more than Baptist was implementing a consistent policy regarding ICU patients in its Hospital to ensure patient care and safety. Similarly, Perry's reliance on directives to keep drug spending within $70 per day, Perry depo. at 59, and the requirement to use computerized physician order entry in order to maintain staff privileges, Perry depo. at 49, demonstrates only consistent policy applied throughout the Hospital for all physicians.

To the extent Plaintiff relies on order sets for treatment, such as for ketoacidosis and asthma, he testified that none of the four PICCS doctors followed the ketoacidosis order set, and there were no repercussions that he was aware of. Perry depo. at 53. Perry also testified that the Hospital dictated certain medications be used or protocols followed. As an example, he stated that Chavez had the nurses combine two medications (Propofol and Ketamine) together as a flat policy, because they would treat each other's bad side effects, and Perry could not get them alone. Perry depo. at 63. But Chavez was a PICCS physician, and the decision to make certain medications available in certain ways is no different from the Hospital deciding to have certain equipment available and not others, and does not demonstrate the Hospital's control over Plaintiff. As to other "directives" that were issued, Perry stated that he had "no idea where they came from" and "some magically appeared in the system." Perry depo. at 64.

Perry's examples fail to demonstrate meaningful control by VHS over him and his work to render it his joint employer. System-wide or Hospital-wide policies are simply conditions for operating within the System or the Hospital applicable to all physicians. Further, many of the requirements are necessary to the Hospital's attempt to fulfill its duties to patients to provide

quality care and abide by federal rules and regulations. Although they demonstrate "control" in a general sense, it is not the type of control sufficient to create a joint employer relationship. If anyone employed Perry, it was only PICCS, but PICCS is too small to be an employer for Title VII purposes. Accordingly, neither PICCS nor VHS are employers under Title VII as a matter of law, and summary judgment is granted on all of Plaintiff's Title VII claims.

## Analysis – Section 1981 claims

PICCS does not move for summary judgment on Plaintiff's claims under § 1981, but VHS moves for summary judgment on the basis that there was no contractual agreement between them.

Perry alleges that he was subject to a hostile working environment, based upon his race, and that he was discharged because of his race and because he complained about the racist environment in which he was forced to work, in  violation of 42 U.S.C. § 1981.  Docket no. 28 at 11. Section 1981 prohibits discrimination on the grounds of race in the making and enforcing of contracts. 42 U.S.C. § 1981(a). *Jeffrey v. Columbia Med. Ctr. at Lancaster Subsidiary LP*, 48 F. App'x 103, at *5 (5th Cir. 2002). The term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(b).

VHS contends that there is no contract here that was interfered with because the Physician Agreement is not a bilateral contract and is not signed by VHS. Further, "it is generally understood that rights promulgated by medical staff bylaws are considered incapable of creating an enforceable contract between the hospital and its physicians." *Van v. Anderson*,

199 F. Supp. 2d 550, 562 (N.D. Tex. 2002). In addition, Plaintiff's staff privileges were not revoked; they were terminated when he allowed his medical malpractice insurance to lapse.

In contrast, Perry contends that the Physician Agreement he signed is a contractual relationship for purposes of § 1981. The PICCS-VHS Coverage Agreement contains a section called "Medical Staff Membership," in which PICCS agreed that medical staff membership and/or clinical privileges of Physician are based upon the Medical Staff Bylaws and that membership and privileges would terminate in accordance with the Medical Staff Bylaws, that the Medical Staff Bylaws would control with respect to peer review matters, and that PICCS would cause each Physician to execute the Physician Agreement attached as Exhibit A. Docket no. 59-2. The Physician Agreement states, "I . . . understand that I am bound by all terms and conditions of the" PICCS-VHS Coverage Agreement and, "In consideration of my approval by Hospital to provide services at North Central Baptist Hospital, pursuant to the Agreement, I knowingly and voluntarily agree" that (1) it is in the best interest of Hospital's ability to provide quality patient care in a cost-effective and efficient manner for Hospital to contract with an exclusive provider and, upon expiration or termination of the Coverage Agreement, Hospital shall have the right to grant an exclusive contract to any person or entity; (2) the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges and unless and until such loss of membership occurs, I am bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff; and (3) if the Agreement expires and/or terminates for any reason, and I continue to hold Medical Staff membership and/or exercise clinical privileges thereafter, this shall not, in any way, waive or restrain the Hospital from granting an exclusive contract for the provision of Services to any

person or entity.  It then states that by his signature he acknowledges that he has carefully read and the Agreement and knowingly and voluntarily agrees to the terms. There is no signature line for VHS.

Plaintiff argues that the Physician Agreement is a contract insofar as it states exactly what Dr. Perry agrees to in exchange for working at VHS. Plaintiff notes that the Physician Agreement even has a severance clause that implies VHS intends the contract to be legally enforceable against the parties to it. Perry emphasizes that he does not allege that being subject to the Bylaws alone creates a contractual relationship between him and the Hospital.

For the same reasons that no employment relationship exists between Plaintiff and VHS, no enforceable contractual relationship exists between them. Although the language of the Physician Agreement implies bilateral consideration by stating that "in consideration for" his approval, Perry makes certain agreements, it creates no enforceable contract rights against VHS. Dr. Gowan testified that the "in consideration of" language means that Perry met privileging and credentialing requirements by the medical staff, not any formal approval by the Hospital. Gowan depo. at 24-25. Further, it was PICCS, not VHS, who required Perry to sign the Physician Agreement, pursuant to its obligations under the Coverage Agreement. The Agreement simply states that Perry understands he is bound by the Coverage Agreement, and that he agrees that the Bylaws shall control any termination of membership and/or privileges, and that he is bound by them until they are terminated. Perry already agreed in the PSA to act consistently with all Bylaws of the medical staff. Thus, the Physician Agreement does no more than restate the fact that the Bylaws control membership and privileges and their termination. To the extent the Physician Agreement creates any additional rights or agreements, it is only that Perry agrees

that the Hospital can enter into a new exclusive agreement with any entity or person even if he maintains membership or privileges; it does not give Perry any additional rights. Thus, this case is no different from other cases holding that staff membership under the medical staff bylaws does not create a contractual relationship with the Hospital. *See Obey v. Frisco Med. Ctr., L.L.P.*, No. 4:13-CV-656, 2015 WL 417425, at *5 (E.D. Tex. Jan. 30, 2015); *Johnson v. Christus Spohn*, No. C–06–138, 2008 WL 375417, at *15 n.90 (S.D. Tex. Feb. 8, 2008) ("Courts in the Fifth Circuit consistently find that medical staff bylaws do not create a contract between a hospital and a doctor and thus do not give rise to contractual rights or contract-based causes of action."), aff'd 334 F. App'x 673 (5th Cir. 2009) ("In Texas, hospital bylaws can create contractual rights in favor of doctors, whereas medical staff bylaws generally do not.")[4]; *Van v. Anderson*, 199 F. Supp. 2d at 562-64 (N.D. Tex. 2002) (dismissing physician's § 1981 claim because "it is generally understood that rights promulgated by medical staff bylaws are considered incapable of creating an enforceable contract between the hospital and its physicians," and "in the absence of a contract with the Defendant Hospital, Plaintiff has failed to satisfy a necessary element for maintaining his Section 1981 action."); *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 888 (Tex. App.–Dallas 2000, no pet.); *Monroe v. AMI Hosps. of Tex., Inc.*, 877 F. Supp. 1022, 1029 n.5 (S.D. Tex. 1994). Further, Plaintiff's privileges ended only when his malpractice insurance lapsed, not when the Hospital CEO asked for Plaintiff to be removed from the PICCS contract, and thus he cannot show that the Hospital interfered with his privileges. *See Van*, 199

---

[4] Medical staff bylaws that recognize that the medical staff is subject to the ultimate authority of the board and do not attempt to define or limit the Hospital's power to act through its board of trustees do not create contractual obligations for the hospital, even though the board may have approved and adopted the staff bylaws. *Johnson v. Spohn*, 334 F. App'x 673, 685 (5th Cir. 2009) (citing *Stephan v. Baylor Med. Ctr. at Garland*, 20 S.W.3d 880, 887-80 (Tex. App.–Dallas 2000, no pet.)).

F. Supp. 2d at 564 ("Moreover, the Plaintiff in this case cannot present any evidence of interference with his privilege to practice at the hospital, since it is unrebutted that Dr. Van's staff privileges were never revoked, but that his privileges were terminated on June 27, 2000 when he voluntarily allowed his privileges to lapse.").

In a footnote, Plaintiff asserts that, even if he did not have a contract with VHS, "the Fifth Circuit has held that 42 U.S.C. § 1981 permits claims against non-employer (and non-contracting) third parties if those third parties exercised control over the complained-of conduct" and "Dr. Perry was subject to control by VHS" insofar as the PSA required him to comply with the rules, regulations, and policies of the Hospital. Citing *Foley v. University of Houston Sys.*, 355 F.3d 333, 337-38 (5th Cir. 2003), he argues VHS may be held liable under Section 1981 for race discrimination and retaliation.

But VHS correctly points out that the Fifth Circuit did not so hold in *Foley*. Rather, the Court stated, "We recently noted in *Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002), that it has not yet been decided 'whether a § 1981 claim lies against an individual defendant not a party to the contract giving rise to a claim.' We have, however, accepted that § 1981 liability will lie against an individual defendant if that individual is 'essentially the same' as the State for the purposes of the complained-of conduct." *Foley*, 355 F.3d at 337 (citations omitted). The district court found genuine issues of material fact as to whether the individual Appellants exercised control over the faculty positions and titles held by the plaintiffs, and, if so, they were "essentially the same" as UHV for purposes of the retaliatory conduct alleged. The Court recognized a tension in its cases with respect to the liability of individual defendants who are not parties to the employment contract, but did "not believe that this is the proper case in which

to decide the outer boundaries of § 1981 liability as it applies to individual non-employer defendants, nor to attempt to catalogue every fact situation which might subject an individual to such liability." Here, Perry is not attempting to hold accountable an individual non-employer defendant, and thus *Foley* is inapposite even if it had decided the issue. Perry's § 1981 claims against VHS are dismissed.

## Conclusion

PICCS's Motion for Summary Judgment (docket no. 58) is GRANTED and all Title VII claims against PICCS are dismissed. Perry's claims under § 1981 remain pending against PICCS.

VHS's Motion for Summary Judgment (docket no. 56) is GRANTED and all claims against VHS are DISMISSED.

The motion to strike (docket no. 63) is GRANTED IN PART, DENIED IN PART, and DISMISSED AS MOOT IN PART.

The Agreed Motion to Stay Discovery and Pending Deadlines (docket no. 70) is GRANTED. PICCS and Perry shall confer and submit a new Scheduling Order to govern the remainder of the case within fourteen days of this Order.

SIGNED this 16th day of March, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE