## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. MELVIN G. PERRY, JR., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No.  SA-18-CV-404-XR |
| PEDIATRIC INPATIENT CRITICAL | § | |
| CARE SERVICES, P.A., | § | |
| *Defendant.* | § | |

## ORDER

On this date, the Court considered Defendants Pediatric Inpatient Critical Care Services, P.A.'s motion for summary judgment (ECF No. 93) and motion to strike the declaration of Dr. Elise Kibler (ECF No. 96), the responses (ECF Nos. 94, 98) and replies (ECF Nos. 95, 99) thereto, and the parties' arguments at the hearing held on September 13, 2022. After careful consideration, the Court issues the following order.

## BACKGROUND

This action under arises out of Plaintiff Melvin Perry's allegedly wrongful termination from his position as a pediatric intensivist at North Central Baptist Hospital (the "Hospital") by Pediatric Inpatient Critical Care Services, P.A. ("PICCS") in early 2017. Plaintiff alleges claims for race discrimination and retaliation under 42 U.S.C. § 1981. *See* ECF No. 28.

### I.  PICCS' Coverage Agreement with the Hospital

Defendant PICCS is a professional association formed under Texas law in December 2014 for the practice of medicine and ancillary services. ECF No. 59-1. PICCS has three directors/owners: Dr. Thomas Gowan, Dr. Hugo Carvajal, and Dr. Nelson Pedro Chavez.

*VHS San Antonio Partners, L.L.C.* ("VHS") runs the Hospital, which maintains a pediatric intensive care unit ("PICU") on its premises. Pediatric intensivists take care of patients in the PICU, which requires 24/7 physician coverage.

In December 2014, PICCS entered into an Agreement for Pediatric Intensive Care Department Coverage with VHS (the "Coverage Agreement") to furnish physicians for full-time coverage to the Hospital's PICU. ECF No. 59-2. PICCS had no other clients and did not provide services to any other Hospital or Hospital System. ECF No. 93-8, Chavez Dep. at 19:5–9. As part of the Coverage Agreement, PICCS agreed to provide physicians for the Hospital's PICU. The Hospital engaged PICCS "on an exclusive basis for [PICCS] to provide to Hospital the Services and supervise the operation of the [PICU] in accordance with" the Agreement.

Each physician was required to be duly licensed and qualified to practice medicine in Texas (and be Board Certified in Pediatrics or Board eligible), be a participating physician in Medicare and in Texas's Medicaid program, and be approved for membership and/or clinical privileges on the medical staff of the Hospital in accordance with the Hospital's Medical Staff Bylaws and Rules and Regulations. The Bylaws are a form of self-governance, created by the Medical Staff of Baptist Health System. ECF No. 57-4, Watkins Decl. ¶ 3. They establish standards for Medical Staff membership and Clinical Privileges and provide means to enforce those standards. *Id*. Physicians apply for Medical Staff Membership and Clinical Privileges to admit and treat patients at the Hospital. *Id.* When membership and/or privileges are granted, the physician agrees to abide by the Bylaws and rules and Regulations, as well as the Professional Code of Conduct. *Id.*

The Coverage Agreement provided that, at all times, "the CEO [of the Hospital] shall have the right to request removal of any such Physician if continued service by such Physician could jeopardize patient care or safety" and PICCS "agrees to immediately remove any such Physician

in accordance with Hospital's Medical Staff Bylaws." Further, the Medical Staff membership and/or clinical privileges of each Physician were "based upon the Medical Staff Bylaws" and "the Medical Staff membership and/or clinical privileges of Director and each Physician at Hospital shall terminate in accordance with the Medical Staff Bylaws"; and 'the Medical Staff Bylaws shall control over this Agreement with respect to peer review."

PICCS eventually contracted services with four physicians to provide coverage for the PICU: Dr. Melvin Perry, Dr. Sandra Aviles, Dr. Lorena Fernandez, and Dr. Nelson Chavez (who was also a shareholder/director of PICCS and was selected as Director of the PICU). ECF No. 59-1 at 36.  Before contracting with PICCS, Dr. Perry met with several individuals who worked at the Hospital, including the PICU nursing staff and the Hospital President (Bill Waechter), toured the Hospital, and met with Dr. Carvajal and Dr. Gowan. ECF No. 57-9; ECF No. 59-1.

## II. Dr. Perry's Profession Services Agreement with PICCS

On March 17, 2015, Dr. Perry entered into a Professional Services Agreement ("PSA") to provide medical services on behalf of PICCS. The Agreement was to commence on the first day Perry provided Services under the Agreement subject to successful completion of all pre-employment processes, including background review, evidence of professional liability insurance coverage, and credentialing by the Hospital.

The Agreement could be terminated by either PICCS or Perry without cause at any time after the expiration of the first twelve months following the commencement date upon 90-days prior written notice or a shorter period mutually agreed upon. The PSA further automatically terminated upon certain occurrences, such as cancellation of malpractice coverage, "Physician conducts himself in a manner that Association determines in good faith to be unethical, unprofessional, unlawful, or fraudulent, is detrimental to patient care, or impairs the reputation or

operations of Association", "Upon [VHS]'s request in accordance with its Medical Staff Bylaws for the removal of Physician due to not meeting the standard of care for rendering patient care services, or that the health, safety, or welfare of patients could be jeopardized by continued services of Physician," and "Any termination or non-renewal of the Coverage Agreement, or the provision of Physician's services under the Coverage Agreement are suspended, or Physician is otherwise removed from providing services under the Coverage Agreement."

As required by the Coverage Agreement, Dr. Perry signed the Physician Agreement on March 26, 2015. ECF No. 59-3. The Physician Agreement states that the Physician understands he is bound by all terms and conditions of the Coverage Agreement and further states, "In consideration of my approval by Hospital to provide services at North Central Baptist Hospital, pursuant to the Agreement, I knowingly and voluntarily agree" that, in relevant part, "the Medical Staff Bylaws shall control any termination of Medical Staff membership and/or clinical privileges and unless and until such loss of membership occurs, he is bound by and subject to all provisions of the Bylaws, Rules and Regulations of Hospital and/or its Medical Staff."

### III.    Dr. Perry's Tenure at the Hospital and Termination from PICCS

Both Dr. Perry and PICCS appear to agree that Dr. Perry worked at the Hospital for approximately eighteen months without incident. Both parties center their theories of his termination on events involving a single patient, H.M., whose injuries were being investigated by Child Protective Services. *See* ECF No. 93 at 5; ECF No. 94 at 1. The patient's mother requested that Dr. Perry testify in court  regarding placement of the patient and whether the child should be discharged. *See* ECF No. 93-20 at 1–2 (Dr. Perry's text messages).

On October 24, 2016, Dr. Perry wrote a letter to Nayomy Figuera, a registered nurse serving as the Director of Pediatric Services, reporting his concerns that the PICU nursing staff

had been acting beyond the scope of their roles and failing to follow medical orders from physicians. *See* ECF No. 94-7. The letter documented instances in which nursing staff did not perform their basic job functions by, for example, failing to perform tests that had been ordered, failing to report critical medical information to Dr. Perry, and, on one occasion, failing to prepare a code sheet for a patient with head trauma who had become unresponsive, even though he had been in the unit for nearly twelve hours. *Id.* at 2. The letter also described examples of nurses acting beyond the scope of their duties, especially in their communications with patients' relatives and other stakeholders. One nurse, for instance, gave inaccurate information about treatment to a patient's mother after being explicitly directed not to discuss the diagnosis—let alone treatment— until a doctor was present to explain the test results. *Id.* And, most germane to this case, the letter addressed the nursing staff's unauthorized and inaccurate communications concerning H.M.

According to Dr. Perry's letter, members of the nursing staff were giving H.M.'s test results directly to his CPS case workers and explaining what the results meant and what treatment would be rendered without consulting with the treating physicians. *Id.* at 1. The case workers, in turn, did not consult with the physicians either, having received the information they sought from the nurses. *Id.* Dr. Perry's letter identifies two problems with this state of affairs. First, it is the physicians who must testify to test results, treatment, and prognosis in court—not the nurses. *Id.* Accordingly, "[s]uch information should be left to the physician to relay." *Id.* Second, some of the information that the nurses shared with the case worker—which the caseworker subsequently presented to the court as the Hospital's and attending physician's medical opinions—was incorrect. *Id.* The position that Dr. Perry laid out in his testimony was "materially different than what the nurses had told the case worker." *Id.*

In addition to these miscommunications with case workers, Dr. Perry missed an opportunity to meet with H.M.'s guardian ad litem because the nurses who spoke with her during a hospital visit "did not bother to inform [him] of who this person was, until after she left." *Id.* at 2. Dr. Perry also reported that the nurses had shared medical information with H.M.'s paternal aunt, who, while appointed to supervise visits with H.M.'s father, had no legal right to his medical information. *Id.* The letter alleges that Dr. Perry spoke with the Hospital's Risk Manager, who agreed that the nurses were outside of their roles from a legal perspective. *Id.*

Two days later, on October 26, 2016, the four PICCS physicians—Dr. Chavez, Dr. Fernandez, Dr. Perry, and Dr. Aviles—met in the physicians' lounge to discuss H.M.'s care., among other things. *See* ECF No. 94-8 (Letter to K. Turton). During the meeting, Dr. Aviles allegedly stated that the nurses had accused Dr. Perry of preferential treatment toward H.M. and his mother because they, like Dr. Perry, were black. *Id.* Later that day, Dr. Perry sent a letter to Kendall Turton, the Hospital's director of human resources, reporting alleged race discrimination by the nursing staff. *See* ECF No. 94-8.

The following day, Dr. Perry also complained of race discrimination to Dr. Chavez, the director of both PICCS and the PICU, in an email. ECF No. 94-9 at 1. Dr. Perry reported that "the accusations of racial bias that [Dr. Aviles] claims were levied by the PICU nursing staff against [Dr. Perry]" and his impression that Dr. Aviles "tacit[ly] endorse[d]" the sentiment. *Id.* Indeed, the email suggests that he was accused of racial bias (in favor of a patient and mother who were both Black) because of his race:

> I never heard a complaint when I showed White patient's [sic] . . . affection. I wasn't biased when I had discussions, sometimes about superficial personal things like travel or my new car shopping . . . No one had an issue when I picked up and carried around the unit Latino patients like I did this week with [a patient] to calm him down. . . . BUT now, after 18 months, the first African American baby I pick [up]

6

or have a superficially personal conversation with, I am accused of racial bias by
not only the staff but seemingly my partner.

*Id.* Dr. Chavez apologized to Dr. Perry, shared his concerns with Dr. Aviles, and indicated that the

accusations of race discrimination would be addressed with the administration "at the highest

level." ECF No. 94-16 at 1 (email from Dr. Chavez to Dr. Aviles).

The nurses, meanwhile, met with Ms. Figuera to report their concerns about what they

perceived to be Dr. Perry's "inappropriate involvement in the CPS investigation." *See* ECF No.

94-10 at 4 (Hospital's EEOC position statement). At a meeting with the nurses in November 2016,

several nurses threatened to quit if Dr. Perry was permitted to continue at the Hospital, complaining

that Dr. Perry ignored them and was condescending and disrespectful. *Id.* In December 2016, Dr.

Aviles also submitted a letter to Dr. Chavez indicating that she refused to work with Dr. Perry.

ECF No. 94-10.

Plaintiff received two complaints from families concerning his quality of care—one in

November and one in December. ECF No. 94-10 at 4. The peer review of the November 2016

complaint indicated that Dr. Perry met the standard of care. *See* ECF No. 94-5. It is unclear whether

a peer review was conducted in connection with the December 2016 complaint, which arose after

Dr. Perry threatened to call CPS if the parents did not consent to a procedure. ECF No. 94-10 at 4.

The family asked that the patient no longer be assigned to Dr. Perry's care. *Id.*

In January 2017, VHS and PICCS made the decision to terminate Dr. Perry's contract. In an

email dated January 10, 2017, Dr. Dana Kellis, VHS's Chief Medical Officer, sent  Bill Waechter

("Waechter"), the Hospital President, the following email:

Bill
I met last evening with Dr. Gowan, Dr. Chavez, and Dr. Gowan's partner, whose
name escapes me right now. Anyway, we reached the decision to tell Dr. Perry that
he is being terminated without cause, which invokes a 90 day out clause in the

contract (he has to be gone within 90 days), and which also minimizes both of our
liability. Let me know if you'd like to discuss further. Thx Dana

ECF No. 94-12. Two days later, PICCS issued a notice of termination signed by Dr. Carvajal,

informing Dr. Perry that his PSA would be terminated in ninety days. ECF No. 94-17. Plaintiff

continued to work at the Hospital until February 28, 2017, when his privileges lapsed after he

failed to renew his malpractice insurance. Defendant replaced Dr. Perry with a white, Hispanic

physician, Dr. Magdelenis Gongora. ECF No. 94-14 at 10.

## IV.    Procedural History

Plaintiff filed this lawsuit on May 3, 2018, alleging claims under Title VII and 42 U.S.C.

§ 1981 for race discrimination. ECF No. 1. Plaintiff filed a First Amended Complaint on December

26, 2018, alleging claims for hostile work environment, discrimination (termination) based on race

and/or sex, and retaliation, and a claim under § 1981 for race discrimination. ECF No. 28. Plaintiff

initially sued both VHS and PICCS, alleging that PICCS was his employer and that PICCS and

VHS were "joint employers" and/or constituted a "single integrated enterprise." ECF No. 1 ¶ 7

(Original Complaint); ECF No. 28 ¶ 7 (Amended Complaint). PICCS and VHS both denied that

they were Dr. Perry's employers. ECF No. 31 (VHS Answer); ECF No. 33 (PICCS Answer). In

June 2019, the Court granted Defendants' motion to bifurcate, allowing limited discovery and the

filing of dispositive motions on the threshold issues of whether Plaintiff was an employee or an

independent contractor and whether PICCS and VHS were his employers for purposes of Title

VII. *See* ECF No. 42.

On March 16, 2020, the Court entered summary judgment in favor of Defendant VHS San

Antonio Partners, LLC d/b/a North Central Baptist Hospital on all claims. *Perry v. Pediatric

Inpatient Critical Care Servs., P.A.*, No. SA-18-CV-404-XR, 2020 WL 10501810, at *1 (W.D.

Tex. May 21, 2020), *aff'd sub nom Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918 (5th

Cir. 2021). The Court concluded that there was no evidence that the Hospital was so involved in the daily employment decisions of PICCS as to treat VHS and PICCS as a single or joint employer. *Id.* at *14, *21. Further, even though the Court found that there were material fact issues as to whether PICCS was Dr. Perry's employer, PICCS did not have the requisite number of employees to constitute an employer under Title VII. *Id.* The Court further held that there was no contract between VHS and Dr. Perry for purposes of § 1981. *Id.* at *23. Plaintiff's § 1981 against PICCS remains pending.

PICCS now moves for summary judgment as to Plaintiffs' claims for race discrimination and retaliation under § 1981. ECF No. 93. Defendant also seeks to strike the declaration of Dr. Elise Kibler, a physician who worked in the Hospital's pediatric inpatient unit. ECF No. 96. The Court held a hearing on September 13, 2022, and denied both motions, for the reasons stated in open court and set out more fully in this order. *See* ECF No. 113.

## DISCUSSION

### I.   Motion to Strike

#### A.  Legal Standard

Rule 12(f) provides that "a district court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Rule 7(a) limits the "pleadings" that may be stricken under Rule 12(f) to: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." FED. R. CIV. P. 7(a).

"Motions to strike are not favored, and portions of complaints should be stricken only if the challenged allegations are prejudicial to the [d]efendant or immaterial to the lawsuit." *Brown*

*v. Etena Ins. Co.*, No. EP–13–CV–131–KC, 2013 WL 3442042 at *2 (W.D. Tex. July 8, 2013) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982)). "As for matters challenged as 'redundant, immaterial, impertinent, or scandalous matter,' a district court should not strike challenged allegations or pleadings simply because they 'offend the sensibilities' of the objecting party." *Id.* (quoting *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012)). Matters that are challenged in pleadings should only be stricken if they possess "no possible relation to the controversy." *Id.* Where a challenged matter is "directly relevant to the controversy at issue" and is at least "minimally supported" by the allegations set forth in the pleadings, it should not be stricken under Rule 12(f). *Id.*

### B. Analysis

Defendant seeks to strike the declaration of Dr. Elise Kibler, a physician who worked in the Pediatrics Unit, which is located on the same floor of the Hospital at the PICU. ECF No. 96. In her declaration, Dr. Kibler testifies as to her observations of Dr. Perry's demeanor and quality of care and of how Dr. Perry and others working in the Hospital were treated. *See* ECF No. 94-3.

Defendant's 17-page motion to strike stages an almost line-by-line attack on Dr. Kibler's declaration. *See* ECF No. 96. Defendant asserts that the declaration "is replete with irrelevant information, impregnated with hearsay and speculation, attempts to make legal conclusions [Dr. Kibler] is not qualified to make, defames physicians and/or essentially accuses physicians . . . of malpractice, and is not based on her personal knowledge." *Id.* at 2. Defendant urges the Court to strike the declaration under Rule 12(f), because it contains statements that would be inadmissible at trial. *See id.* at 6 (citing *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) ("[O]n a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

As a preliminary matter, the motion is legally deficient in two respects. First, Plaintiff correctly observes that the motion is procedurally improper, as Rule 12(f) only allows a court to strike matters from pleadings, and the declaration is not among the "pleadings" enumerated in Rule 7(a). *See* FED. R. CIV. P. 7(a), 12(f). "[A]lthough Rule 12(f) authorizes the court to 'strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter,' it only applies to pleadings." *Sec. & Exch. Comm'n v. Faulkner,* No. 3:16-CV-1735-D, 2019 WL 2515000, at *1 (N.D. Tex. June 18, 2019) (collecting cases) (citations omitted). Second,  summary judgment evidence does not need to be in admissible form as long as it can be presented in admissible form at trial. FED. R. CIV. P. 56(c)(2); *Maurer v. Independence Town*, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form.").

Defendant repeatedly asserts that Dr. Kibler lacks personal knowledge regarding the statements in her declaration and that her statements are conclusory. Contrary to Defendant's objections, the second sentence of the declaration states "the facts contained in this declaration are true and correct and are within my personal knowledge." ECF No. 94-3 ¶ 1. More importantly, Dr. Kibler also explains throughout the declaration that her personal knowledge was derived through observation and interactions with staff, including Dr. Perry, while she was working at the Hospital.[1] *See Harris v. Pel-State Bulk Plant, LLC,* No. MO:17-CV-00096-RAJ, 2018 WL

---

[1] For example, Defendant objects to Dr. Kibler's statements that (1) she and Dr. Perry "both worked at North Central Baptist Hospital taking care of pediatric patients there," and (2) "[they] often interacted and [she] was able to observe how [Dr. Perry] behaved and how he was treated." ECF No. 96 at 9. These statements are misleading, according to Defendant, because they "can erroneously lead the reader to conclude that [Dr. Kibler] and Plaintiff worked together in the same unit, in close proximity, which, is not factually correct." *Id.* "While this children's unit is on the same floor as the PICU," Defendant submits, "the units were separate and apart from each other - down the hall from each other. And each unit was behind closed doors." *Id.* at 3. To put it gently, the notion that a closed door and a hallway would prevent professional interaction between two doctors treating pediatric patients on the same floor of the same Hospital strains credulity.

In a similarly bizarre fashion, Defendant challenges Dr. Kibler's testimony on the basis that she is certified in general pediatrics and is not a pediatric intensivist, and thus "did not work for PICCS and did not work in the

2432963, at *2 (W.D. Tex. Jan. 5, 2018) ("A declaration can also overcome evidentiary objections to a declarant's personal knowledge when the declaration contains a statement that it is based on personal knowledge."). Further, it appears that Plaintiff intends to call Dr. Kibler as a witness at trial. *See* ECF No. 100-2. To the extent that Defendant objects to Dr. Kibler's competence to testify on certain subjects based on her alleged lack of personal knowledge, Plaintiff will have an opportunity at trial to lay the foundation for her testimony at trial, subject to Defendant's cross examination.

Indeed, many of Defendant's objections bear on the weight of Dr. Kibler's testimony rather than its admissibility and are more properly the subject of cross-examination at trial than of a motion to strike. For example, Dr. Kibler's observations of Plaintiff's performance and that of Dr. Aviles, one of the physicians whom Dr. Perry has identified as a comparator, are clearly relevant to whether the stated reasons for Dr. Perry's termination were pretextual. It is well-established that statements from coworkers detailing personal observations that contradict the employer's stated reason are competent pretext evidence. *See Abuan v. Level 3 Comms., Inc.*, 353 F.3d 1158, 1174 (10th Cir. 2003) ("Mr. Abuan's co-workers' assessment of his work, however, is clearly probative of pretext."); *Dey v. Colt Const. & Devel. Co.*, 28 F.3d 1446, 1460-61 (7th Cir. 1994); *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 501 (6th Cir. 2016) ("Although Pappas and Fluty did not have personal knowledge of why Casagrande was fired, they could testify to indirect evidence that

---

PICU—she is not qualified to do so." ECF No. 96. As a preliminary matter, the Court observes that Dr. Aviles—a PICCS physician who works in the PICU—is not board certified in pediatric critical care. ECF No. 94-18 at 19–21. She, like Dr. Kibler, is certified in general pediatrics, and was later granted a waiver to practice in pediatric critical care. *Id.* at 23–25. It is unclear to the Court how Dr. Kibler's board certification in general pediatrics renders her testimony unreliable and irrelevant, while Dr. Aviles's identical certification is, evidently, not disqualifying in any way. While the Court acknowledges that there are differences between the practice of general pediatrics and pediatric critical care, it is not clear how those differences are relevant to the proffered reason for Dr. Perry's termination—his allegedly inappropriate involvement in H.M.'s CPS investigation and tensions with PICU nursing staff, which developed over a period of *months* in the fall of 2016.

would support an inference that his termination was retaliatory."); *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1422 (3rd Cir. 1991) ("the affidavits of Colgan's co-workers, rejected by the district court, support an inference of discrimination . . . This information goes to whether his poor evaluation . . . was a pretext for age discrimination."); *E.E.O.C. v. Boeing Co.,* 577 F.3d 1044, 1051 (9th Cir. 2009) ("[S]pecific positive evaluations of Castron's performance, both by coworkers and other managers . . . [is] relevant to determining the existence of pretext."). Defendant will have a chance at trial to question Dr. Kibler about her opportunities to observe Dr. Perry's performance and his treatment by other Hospital staff.

In several instances Defendant asks the Court to strike statements from Dr. Kibler's declaration because they conflict with testimony from other witnesses in the case. *See, e.g.*, ECF No. 96 at 11 (arguing that Dr. Kibler's assertion that Plaintiff "was always very respectful" is "contrary to Dr. Chavez' specific, relevant testimony, where there is no dispute in evidence the nurses complained about Plaintiff's demeanor."). On summary judgment, the Court is not in a position to strike Dr. Kibler's testimony simply because it conflicts with testimony from other witnesses—the Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *Reeves*, 530 U.S. at 150. Again, PICCS will have an opportunity to cast doubt on Dr. Kibler's credibility through cross-examination at trial.

As stated in open court, Defendant's motion to strike Dr. Kibler's declaration (ECF No. 96) is **DENIED**, but the denial is without prejudice to re-urging in the form of appropriate objections at trial.

## II.  Motion for Summary Judgment

### A.  Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## B.  Analysis

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . ." 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. 1981(b). When used as parallel causes of action, Title VII and § 1981 require the same proof to establish liability. *Bunch v. Bullard*, 795 F.2d 384, 387 n.1 (5th Cir. 1986); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) (Title VII and § 1981 are "are functionally identical" for the purposes of claims for employment discrimination and retaliation).

### 1.  PICCS' Liability for VHS's Discrimination and Retaliation

Defendant insists that it cannot be held liable for Plaintiff's claims because PICCS merely "complied with [VHS]'s request [to remove Plaintiff from the Hospital] pursuant to its contractual obligations with VHS." ECF No. 93 at 14. Thus, PICCS argues that, even if VHS did discriminate and retaliate against Dr. Perry by demanding his removal, PICCS should not be held liable. *Id.* The Court disagrees.

Customer preference does not justify unlawful discrimination. *See Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971), *cert. denied*, 404 U.S. 950 (1971); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1277 (9th Cir. 1981). The Fifth Circuit has held that "it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the [otherwise unlawful] discrimination was valid." *See Diaz*, 442 F.2d at 387. If VHS requested Dr. Perry's removal because of his race or protected activity, PICCS is liable for acquiescing to that discriminatory customer preference. *Id.*

## 2. Plaintiff's Hostile Work Environment Claim under 42 U.S.C. § 1981

Defendant asserts that alleged racially charged comments by Hospital staff do not rise to the level of hostile work environment claim. ECF No. 93 at 24–27. Here, Defendant refers to statements by nurses and doctors described in Dr. Perry's deposition testimony, including alleged comments by various VHS nurses who (1) referred to him as "chocolate eye candy," "homey," and "boy," (2) suggested to Dr. Perry that white police officers were justified in shooting Black men, and (3) asked about his experiences with the Ku Klux Klan. *See id.* (citing ECF No. 93-5, Perry Dep. (March 17, 2022) at 81:12, 149:22–25, 150:1–2, 153:12–17, 156:14, 159:5, 160:3–14 164:21–22)). Though not referenced in Defendant's motion, the Court observes that Plaintiff has also offered evidence that Dr. Aviles referred to an African American nephrologist as "that black bitch," ECF No. 93-5, Perry Dep. (March 17, 2022) at 81:16–21, and that Dr. Carvajal stated that

that he did not hire a particular African American physician "because since she is black, she would probably sue us," ECF No. 94-3, Kibler Decl. ¶ 4.

Plaintiff's response does not address his hostile work environment claim, *see generally* ECF No. 94, and his counsel confirmed at the September 13 hearing that Plaintiff does not intend to pursue such a claim. Thus, Defendant's motion for summary judgment as to Plaintiff's hostile work environment claim alleged in Plaintiff's Amended Complaint, is **GRANTED**. Nonetheless, the race-related statements bear on Plaintiff's disparate treatment claim insofar they offer relevant, admissible evidence of the Hospital staff members' state of mind when they threatened to quit unless Plaintiff was terminated. *See, e.g.*, *Laxton v. Gap*, 333 F.3d 572, 583 (4th Cir. 2003) ("an oral statement exhibiting discriminatory animus may be used to demonstrate pretext, or . . . used as additional evidence of discrimination.").

### 3.   Claim for Disparate Treatment under 42 U.S.C. § 1981

Where a plaintiff lacks direct evidence of discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* governs. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In order to survive summary judgment under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for the position at issue, (3) he suffered an adverse employment action, and (4) he was replaced by someone outside the protected class or was treated less favorably than others similarly-situated. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. 792 and *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000)).

If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Okoye*, 245 F.3d at 512. If the

defendant satisfies its burden of production, the plaintiff may still prevail by offering sufficient evidence to create a genuine issue of material fact that either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that although the defendant's reason is true the plaintiff's protected characteristic was a "motivating factor" in its decision. *McDonnell Douglas*, 411 U.S. at 804–05; *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 394 (5th Cir. 2008). Thus, to survive summary judgment, the plaintiff must raise a fact issue as to whether the employer's proffered reason was either mere pretext for discrimination or only one motivating factor. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016).

**(a) Plaintiff has established a prima facie case of race discrimination**

The Court concludes that Plaintiff has established a prima facie case of race discrimination under Title VII. It is undisputed that Plaintiff is a member of a protected racial class (Black), and his termination clearly constitutes an adverse action. Defendant disputes that Plaintiff was qualified for his position in the PICU. ECF No. 93 at 14–17. Defendant also challenges Plaintiff's ability to satisfy the fourth element of the prima facie case, asserting that he has "waived" the position that he was replaced by someone outside of his protected status, *id.* at 18 n.1, and that Dr. Aviles is not an appropriate comparator, ECF No. 95 at 8 n.16.

Defendant's arguments that Plaintiff was not qualified for the position because VHS "requested his removal" and because Dr. Perry allowed his credentials at the Hospital to lapse after he was notified of his termination are both unavailing. ECF No. 93 at 14–17. "Qualifications" for a job refer to objective factors, such as "degrees, certificates, skills and experience." *Taylor v.*

18

*Cnty. Bancshares, Inc.*, 325 F. Supp. 2d 755, 769–70 (E.D. Tex. 2004) (citing *Loeb v. Textron,*

*Inc.*, 600 F.2d 1003, 1013 n.10 (1st Cir. 1979)). Generally, "unless the employee's job has been

redefined, the fact that [he] was hired initially indicates that [he] had the basic qualifications for

the job, in terms of degrees, certificates, skills and experience." *Id.* Thus, "a plaintiff challenging

[his] termination or demotion can ordinarily establish a prima facie case of . . . discrimination by

showing that [he] continued to possess the necessary qualifications for [his] job at the time of the

adverse action." *Id.* (citing *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1505–06 (5th Cir.

1988)).

Defendant relies on *Toomer v. CACI, Inc.- Fed.* for the proposition that terminating an

employee at a client's request renders the employee unqualified for the relevant position. ECF No.

93 at 16–17 (citing No. 8:12-CV-2832-T-26EAJ, 2013 WL 12090674, at *5 (M.D. Fla. Dec. 13,

2013), *aff'd*, 566 F. App'x 886 (11th Cir. 2014)).[2] *Toomer* is neither binding nor, in the Court's

view, persuasive. First, as discussed above, an entity cannot escape liability by arguing that it was

merely a pass-through for its customer's discriminatory preferences. *See Diaz*, 442 F.2d at 389;

*Fernandez*, 653 F.2d at 1277. Further, as a matter of semantics, it might be said that any person

who was terminated or demoted from—or, for that matter, not hired for or promoted to—a position

was not "qualified" for the position by virtue of the employment decision itself. The Court will not

countenance such word play. *Cf. Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187,

---

[2] Defendant also cites multiple cases for the proposition that removing an employee from a project does not constitute an adverse employment action. *See* ECF No. 93 at 14. These cases involved temporary staffing agencies, however, in which the agency maintained its relationship with the employee even after removing them from an assignment at the client's request. *See, e.g.*, *Shah v. Dobbs Temp. Servs., Inc.*, Civil Action No. 1:05-CV-1706-RWS-LTW, 2007 WL 9701242, at *12 (N.D. Ga. Aug. 8, 2007), *report and recommendation adopted*, 2007 WL 9837061 (N.D. Ga. Sept. 27, 2007) (no adverse employment action where staffing agency kept the plaintiff employed after removing the employee from an assignment and even offered the plaintiff other assignments); *Neal v. Manpower Int'l, Inc.*, No. 3:00-CV-277/LAC, 2001 WL 1923127, at *9 (N.D. Fla. Sept. 17, 2001) ("Manpower did not terminate its relationship with Neal, but attempted to provide her various alternative employment positions, which Neal did not utilize . . . ."); *Mullis v. Mechanics & Farmers Bank*, 994 F. Supp. 680, 686 (M.D.N.C. 1997) (same). Here, Plaintiff was terminated by PICCS.

207 (1991) ("It is word play to say that 'the job' at Johnson [Controls] is to make batteries without risk to fetuses in the same way 'the job' at Western Air Lines is to fly planes without crashing."). Permitting employers to rely on the allegedly discriminatory adverse employment action itself as evidence that the employee was not qualified for the position at issue would read the protections of Title VII and § 1981 out of existence.

Here, the fact that Plaintiff was hired to work in the PICU indicates that he was objectively qualified for the position from which he was terminated, as does his continued employment in the PICU for several weeks after receiving notice of his termination. The Hospital does not, presumably, permit unqualified physicians to practice in its critical care units. The termination decision likewise predated the lapse in Dr. Perry's malpractice insurance that led to the loss of his credentials, which was itself a consequence of his termination. Given that Dr. Perry continued to work in the PICU after receiving notice of his termination, the Court concludes that he was objectively qualified for his position when the termination decision was made.

As to the fourth element of his prima facie case, Plaintiff has proffered evidence showing that he was replaced by a physician outside of his protected class, Dr. Magdelenis Gongora. *See* ECF No. 94-4, Chavez Dep. at 12:7 (testifying to his belief that Dr. Gongora is white); ECF No. 94-14 at 9–10 (indicating that Dr. Gongora's ethnicity is Hispanic). Despite Defendant's contention that Plaintiff waived this position by failing to plead it, PICCS did not supplement its answers to Plaintiff's first set of interrogatories indicating that a replacement physician had been hired until April 2022, over three years after the filing of the operative complaint. *Compare* ECF No. 28 (Amended Complaint, filed on December 26, 2018) *with* ECF No. 94-14 at 12 (indicating

that Defendant's supplemental responses to Plaintiff's first set of interrogatories were served on April 1, 2022).[3]

Moreover, Plaintiff asserts that he was treated less favorably than two other physicians outside of his protected class, Dr. Aviles and Dr. Chavez. ECF No. 94 at 15–17. Dr. Kibler and Dr. Perry each testified that some nurses complained about and refused to work with Dr. Aviles. *See* ECF No. 94-6, Perry Dep. at 258:12–15; ECF No. 94-3, Kibler Decl. ¶ 11. Dr. Chavez testified that *all* of the PICCS doctors had been subject to peer review for standard of care issues and all had received complaints from family. ECF No. 94-4, Chavez Dep. at 72:14–19. Dr. Chavez himself has had a family request that he no longer serve as a patient's treating physician. *Id.* at 70:2–15. Finally, Dr. Kibler described some of Dr. Aviles's standard of care issues, including a botched intubation that caused a lifelong condition. ECF No. 94-3, Kibler Dep. ¶ 13. She also described some of the personality conflicts Dr. Aviles had with other staff members and difficulty getting along with some of the nursing staff. *Id.* ¶¶ 11, 16–18.

In sum, Dr. Aviles and Dr. Chavez both had contracts with PICCS, worked in the Hospital at the PICU, and have been the subject to peer review of their quality of care and of complaints from families. Both are sufficiently similarly situated to Dr. Perry to serve as proper comparators in the Fifth Circuit. *See Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 262 (5th Cir. 2009) (concluding that disparate treatment of two employees who held identical positions at the same

---

[3] To the extent that Plaintiff's pleadings must be further amended to include his replacement by an individual outside of his protected status, such an amendment would satisfy the good cause requirement of Rule 16(b)(4). In evaluating a motion to amend pleadings filed after the Scheduling Order deadline, the courts considers:  (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008). It is unclear when Dr. Gongora was hired, but, given that Defendant did not supplement its interrogatory responses until April 1, 2022, Plaintiff's failure to seek leave to amend prior to that date can be excused. The amendment is important to Plaintiff's prima facie case, given that he was replaced by someone outside of his protected class. Finally, given that Defendant objected to the interrogatory as "a fishing expedition for [Plaintiff's] *prima facie*," PICCS was clearly on notice that Plaintiff intended to take this position. ECF No. 94-14 at 10. Thus, Defendant would not be prejudiced by the amendment.

company, compiled a similar number of serious moving violations over a similar period of time, and whose ultimate employment status rested with the same person could be properly compared for the purposes of establishing the plaintiff's prima facie case). Any differences between Plaintiff and his comparators may very well be relevant to the jury's determination of whether Defendant's proffered reason for terminating Dr. Perry can explain why he was terminated and his peers were not. *Id.* For the purposes of establishing Plaintiff's prima facie case, however, Dr. Aviles and Dr. Chavez are adequate comparators.

Because Plaintiff has met his initial burden, the burden of production shifts to Defendant to provide a "legitimate, nondiscriminatory reason" for the termination. In order to meet its burden, Defendant must provide both "clear and reasonably specific reasons" for its actions. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). The reason must be articulated with sufficient clarity to allow a realistic opportunity to show the reason is not pretextual. *Id.* The reason itself, if true, must also negate discrimination. *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004). This is a slight burden, but it is still a burden. *Id.* ("[A] defendant employer must articulate in some detail a more specific reason than its own vague and conclusional feeling about the employee."). A reason that is "at least as consistent with discriminatory intent as it is with nondiscriminatory intent" does not meet the defendant's burden of production. *Id.* ("We hold as a matter of law that justifying an adverse employment decision by offering a content-less and nonspecific statement . . . is not specific enough to meet a defendant employer's burden of production under *McDonnell Douglas*. It is, at bottom, a nonreason.").

Here, Defendant offers several reasons for Plaintiff's termination from PICCS. The first— that VHS requested Plaintiff's removal—is unpersuasive because Plaintiff alleges VHS's request was itself discriminatory. *See Diaz*, 442 F.2d at 389 (customer preference does not justify unlawful

discrimination). Likewise, Defendant's assertions that Plaintiff was terminated because of his involvement in H.M.'s CPS investigation and subsequent difficulty working with the nursing staff are equally unavailing because both explanations are equally consistent with discriminatory intent as they are with nondiscriminatory intent. That is, Plaintiff alleges that his involvement in H.M.'s case was only considered a problem because of his race and that the PICU nurses who refused to work with him were motivated by racial animus. Neither reason negates discrimination.

Finally, Defendant turns to the Hospital's "concerns about [Plaintiff's] behavior," ECF No. 95 at 4, that could jeopardize "patient care or safety," *id.* at 5. Concern about Dr. Perry's "behavior" is too vague a reason to allow a realistic opportunity to show that the reason is not pretextual. Indeed, it might as easily be said that that Ann Hopkins missed out on a promotion because of Price Waterhouse's "concerns about her behavior." *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 236–37 (1989) ("[T]he judge went on to decide . . . that some of the partners' remarks about Hopkins stemmed from an impermissibly cabined view of the proper behavior of women, and that Price Waterhouse had done nothing to disavow reliance on such comments."). Or that Gerald Bostock was terminated from his position as a child welfare advocate based on "concerns about his behavior." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1738 (2020) ("Not long after [Mr. Bostock began participating in a gay recreational softball league], influential members of the community allegedly made disparaging comments about Mr. Bostock's sexual orientation and participation in the league. Soon, he was fired for conduct 'unbecoming' a county employee."). Such an explanation would not have sufficed in these seminal employment discrimination cases, and it does not suffice here. Likewise, medical employers cannot shield their employment decisions from scrutiny by waiving the magic words "patient care and safety" and demanding that the Court—and, subsequently, a jury—take them at their word. Court and juries are frequently

called upon to evaluate medical evidence in cases involving medical malpractice, toxic torts, and garden variety personal injury claims. Defendant has not offered an explanation as to how Dr. Perry's involvement in H.M.'s CPS proceedings, his relationship with the PICU nurses, or even the complaints he received from families jeopardized patient safety.

Aside from the lack of specificity, there are several reasons to doubt Defendant's proffered reasons for Plaintiff's termination. First, Defendant's "patient safety" explanation is not even internally consistent. Dr. Kellis explained that, she, along with the PICCS directors, "reached the decision to tell Dr. Perry he was being terminated without cause . . . which minimizes both of our liability." ECF No. 94-12. If Dr. Perry posed a threat to patient care and safety it seems unlikely that the best way to "minimize liability" for both VHS and PICCS would be to allow an allegedly dangerous physician to continue treating PICU patients for 90 more days. ECF No. 94-12 at 1. Second, it is not clear that Dr. Perry posed a greater threat to patient safety than his PICCS colleagues. A peer review of the November 2016 patient complaint indicated that Dr. Perry met the standard of care. *See* ECF No. 94-5. Moreover, it appears that nurses and patients have complained about other PICCS physicians and that all PICS physicians have been subject to peer review. *See* ECF No. 94-6, Perry Dep. at 258:12–15; ECF No. 94-3, Kibler Decl. ¶ 11; ECF No. 94-4, Chavez Dep. at70:2–15, 72:14–19. Finally, Defendant's shifting reasons for terminating Plaintiff over time suggest that the proffered explanations are pretextual. When an employer's statements have "not remained the same" over the course of a dispute, a jury can infer that the stated reason for the adverse action is pretextual. *Nasti v. CIBA Specialty Chem. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) ("A court may infer pretext where a defendant has provided inconsistent or conflicting explanations for its conduct.").

At the time of his termination, Plaintiff was told he was being terminated "without cause." ECF Nos. 94-12, 94-17. Then VHS told the EEOC that Dr. Perry's removal was demanded because he "could jeopardize patient care and safety," referencing his deteriorating relationship with the PICU nurses and explaining that the December 2016 complaint from a patient's family "lead [sic] to the Hospital's decision" to ask that Dr. Perry be removed from the PICU. ECF No. 94-5 at 5. PICCS later proffered another element, through Dr. Gowan's assertion that Dr. Perry's "conduct met the inappropriate behavior standard in the Medical Staff Rules & Regulations" and "could jeopardize patient care or safety." ECF No. 59-1, Gowan Decl. ¶¶ 40–41. Dr. Chavez provided conflicting testimony, asserting that Dr. Perry was performing within the standard of care and PICCS did not want to terminate his contract and did so only at the Hospital's request. *See* ECF No. 94-4, Chavez Dep. at 93:3–11. These inconsistent explanations for Plaintiff's termination are sufficient to allow a reasonable jury to conclude that they are pretextual. *See Burrell*, 482 F.3d at 415.

Viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that Defendant's vague and inconsistent explanations for Plaintiff's termination, together with the other evidence of racial animus among the nursing staff, are sufficient to create a genuine issue of material fact as to whether he was actually terminated because of his involvement in H.M.'s CPS proceedings or because of the complaints he received from nurses and patients' families. That is enough to meet his burden at the pretext stage of the analysis. *Reeves*, 530 U.S. 133, 143; *Vaughn*, 665 F.3d at 637. "If the trier of fact does not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit—that it acted for retaliatory or discriminatory reasons." *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 569–70 (5th Cir. 2011). Thus, "a plaintiff's *prima facie* case,

combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Ameristar Airways, Inc. v. Admin. Review Bd.*, 650 F.3d 562, 570 (5th Cir. 2011); *see also Vaughn*, 665 F.3d at 637–38 ("Such rebuttal evidence, combined with the *prima facie* case, will suffice to create a genuine issue of material fact such that summary judgment is inappropriate.").

### 4.   Claim for Retaliation

In the Fifth Circuit, retaliation claims under 42 U.S.C. § 1981 are analyzed identically to claims under Title VII. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002). Accordingly, the *McDonnell Douglas* burden-shifting framework also governs Plaintiff's retaliation claims. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (the *McDonnell Douglas* test applied to Title VII disparate treatment cases is also applicable to Title VII unlawful retaliation cases."). The prima facie case for retaliation requires the plaintiff to show: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015).

"Protected activity" is defined as "opposition to any practice made unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Green v. Admins. of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Apr. 26, 2002) (citing 42 U.S.C. § 2000e–3(a)). The retaliation provisions of Title VII have been interpreted to "protect[] not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). An employee that files an internal complaint of discrimination engages

in a protected activity." *Flowers v. Tex. Mil. Dep't*, 391 F. Supp. 3d 655, 668 (S.D. Tex. 2018) (citing *Rodriquez v. Wal-Mart Stores, Inc.*, 540 F. App'x 322, 328 (5th Cir. 2013) (concluding that, while opposition to discrimination need not be in formal written form, the plaintiff's internal complaints to management did not constitute a protected activity because "they did not allege discrimination or any other unlawful employment activity").

In order to establish the causal link, "the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1122 (5th Cir. 1998). Close timing between an employee's protected activity and an adverse action against him is frequently used to establish the "causal connection" required to make out a *prima facie* case of retaliation. *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir. 1993)). There is no bright-line rule in the Fifth Circuit for determining whether the time between the protected activity and the allegedly retaliatory conduct is too remote. *See Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992) (declining to hold that the passage of fourteen months between the filing of the plaintiff's EEOC complaint and the date of termination was "legally conclusive proof against retaliation"); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that "a time lapse of up to four months has been found sufficient" evidence of a causal connection). "Consideration of such dates is part of our analysis, but not in itself conclusive of our determinations of retaliation," especially where there is other evidence of retaliatory intent. *Shirley*, 970 F.2d at 40.

Once the plaintiff meets this prima facie burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason" for the adverse employment action. *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 359 (5th Cir. 2017) (citing *Raggs*, 278 F.3d at 468). And,

finally, once the employer supplies such a justification, the "burden then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's nondiscriminatory explanation is pretextual." *Id.*

Plaintiff has stated a prima facie case for retaliation. Dr. Perry engaged in protected activity on multiple occasions in October 2016. On October 26, 2016, Dr. Perry sent a letter to the Hospital HR director alleging race discrimination by the nursing staff. *See* ECF No. 94-8. The next day, Dr. Perry sent an email to Dr. Chavez, the director of both PICCS and the PICU, outlining allegations of race discrimination. ECF No. 94-9 at 1. It is undisputed that Dr. Perry suffered an adverse action when PICCS terminated him on January 12, 2017, less than three months after Plaintiff's protected activities. *See Evans,* 246 F.3d at 354 (time lapse of four months is sufficient to satisfy the causal connection for summary judgment purposes).

The Court's analysis of Defendant's proffered reasons for the termination and the evidence that the reasons were pretextual applies to both Plaintiff's claim for race discrimination and his claim for retaliation. Defendant responds that, in the Fifth Circuit, Plaintiff must establish that the protected activity was the "but-for" cause of the adverse employment action. *See* ECF No. 95 at 10 (citing *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022); *Wantou v. Wal-Mart Stores Texas, L.L.C.,* 23 F.4th 422, 437 (5th Cir. 2022) (in a retaliation claim under § 1981, "the employee's ultimate burden is to prove that the adverse employment action would not have occurred but for the protected conduct.")). The Fifth Circuit has held that temporal proximity alone is insufficient to establish "but for" causation. *Strong v. Univ. Healthcare Sys. LLC*, 482 F.3d 802, 808 (5th Cir. 2007). Still, courts have recognized numerous ways in which plaintiffs can circumstantially show causation at the prima facie stage or at the pretext stage. *See, e.g.*, *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 361 (5th Cir. 2017). Aside from timing, relevant

evidence may include "specific conversations with knowledgeable colleagues, changed decisionmaker behavior following complaints, pretext, and parallel outcomes for similarly-situated employees. *Id.* (also recognizing and shifting employer rationales and an employer's departure from typical policies and procedures).

Plaintiffs may combine "suspicious timing with other significant evidence of pretext." *Shackleford*, 190 F.3d at 409. The Court concludes that, together with Plaintiff's prima facie case of retaliation, the evidence of pretext—especially the statement that terminating Plaintiff without cause would help PICCS and VHS "minimize liability"—are sufficient to create a genuine issue of material fact as to whether Plaintiff would not have been terminated but for his protected activity. Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's claim for retaliation must be denied.

### 5. Plaintiff's Damages

Finally, Defendant argues that Plaintiff cannot establish his claims for damages. ECF No. 93 at 27–29. Plaintiff seeks reinstatement, front pay in lieu of reinstatement, back pay damages, and compensatory and punitive damages. ECF No. 28 ¶ 32. In its reply brief, Defendant suggests that the Court must grant summary judgment as to the claims for damages because Plaintiff failed to address Defendant's arguments in his response brief. *See* ECF No. 95 at 1 n.1. But this position misconstrues the parties' relative burdens on summary judgment.

Before the burden shifts to the nonmovant to establish that summary judgment is inappropriate, the movant "must submit evidence that *negates* the existence of some *material element* of the non-moving party's claim or defense, or, if the *crucial issue* is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an *essential element* of the nonmovant's claim or defense. *Little*,

952 F.2d at 847 (emphasis added). "Although Rule 56(e) does not allow a party to rest upon the mere allegations or denials of his pleading when his adversary moves for summary judgment, the Rule does not relieve the movant of his duty to establish the absence of a genuine issue as to material facts. The moving party still has the initial burden, under Rule 56(c), of showing the absence of a genuine issue concerning any material fact, and of showing that judgment is warranted as a matter of law." *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213–14 (5th Cir. 1976) (citations and quotation marks omitted). The moving party does not meet this burden by simply laying out every potential point of disagreement with or counterargument to the opposing party's positions. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," not to force the nonmoving party to disclose every aspect of its anticipated trial strategy. Advisory Committee Note to 1963 Amendment of FED. R. CIV. P. 56(e). The Court will not presume that Defendant has met its burden on summary judgment simply by virtue of having filed a motion.

Plaintiff has started his own practice and conceded during his deposition that reinstatement would be "impossible." ECF No. 93-5, Perry Dep. at 265:7–8. From this fact, Defendant appears to imply that front pay is unwarranted:

> Plaintiff also seeks one year of compensation in lieu of reinstatement. "The court should not award front pay unless it is necessary to make the plaintiff whole and it is to compensate the plaintiff for lost future wages and benefits." *Scudiero v. Radio One of Tex. II,* LLC, Civil Action No. 4:12-CV-1088, 2015 WL 6859146 (S.D. Tex. Sept. 30, 2015) (citing *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 526 (5th Cir. 2001). Front pay awards must be carefully crafted to avoid a windfall to the plaintiff since front pay is not supposed to be punitive. *Id*. (quoting *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490 (5th Cir. 2007). The award should be reduced by potential future earning. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 n. 27 (5th Cir. 2001). The court must also consider plaintiff's failure to mitigate damages. *Jackson v. Host Intern., Inc.* 426 F. App'x 222, 223 (5th Cir. 2011). To determine whether front pay is an appropriate remedy, a court should consider the length of prior employment, the permanency of the position held, the nature of the work, the age and physical condition of the employee, and possible consolidation

> of jobs." *Dibler v. Metwest, Inc.*, No. CA3:95-CV-1046-BC, 1997 WL 222910, at
> * 3 (N.D. Tex. April 29, 1997).

ECF No. 93 at 28. While the Court does not dispute the accuracy of this summary of relevant legal considerations in awarding front pay, Defendant's briefing does not negate the existence of a material element of Plaintiff's claim for front pay. *Little*, 952 F.2d at 847. Nor does it point to the absence of evidence supporting an essential element of Plaintiff's claim for front pay. ECF No. 93 at 28. The motion simply observes that Plaintiff seeks front pay and describes factors the Court should consider in crafting such an award, without explaining how any of the factors bear on this case. Defendant has not met its initial summary judgment burden with respect to Plaintiff's claim for front pay.

With respect to Plaintiff's claim for back pay, Defendant notes that "[b]ack pay is an equitable remedy designed to make the injured party whole and the injured party has a duty to use reasonable diligence to attain substantially similar employment and thereby mitigate damages." *Id.* (citing *Jackson v. Host Int'l, Inc.* 426 F. App'x 222 (5th Cir. 2011)). Here, Defendant argues that Plaintiff cannot establish damages beyond February 28, 2017, when his Hospital privileges lapsed after he failed to renew his malpractice insurance. Alternatively, Defendant asserts that Plaintiff had an offer for contract employment with an organization called WellStar around May 2018, but the contract was terminated when he complained that he would not get along with the white, female doctor he met during a visit because he believed she was racist and xenophobic.

Defendant's arguments concerning back pay amount to an argument that Plaintiff failed to mitigate his damages. While Dr. Perry does have a duty to mitigate his damages by using reasonable diligence to obtain substantially equivalent employment, PICCS bears the burden of proving Dr. Perry's failure to mitigate at trial. *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990). Whether Dr. Perry has engaged in such an effort is a question of fact. *Id.* "The

reasonableness of a Title VII claimant's diligence 'should be evaluated in light of the individual characteristics of the claimant and the job market.'" *Id.* (quoting *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983)). The obligation to mitigate damages does not require the claimant to accept a position noncomparable or inferior to his previous position. *EEOC v. Exxon Shipping Co.*, 745 F.2d 967, 978 (5th Cir. 1984).

Plaintiff's counsel confirmed at the September 13, 2022 hearing that Dr. Perry permitted his privileges to lapse at the Hospital because of his termination and that Dr. Perry had included a calculation of his claims for backpay in his initial disclosures. Especially given that Dr. Perry eventually established his own practice, the Court cannot conclude that his failure to accept a single position constitutes a failure to mitigate that defeats his claim for backpay as a matter of law. Thus, Defendant's motion for summary judgment as to Plaintiff's claim for damages is denied.

## CONCLUSION

For the foregoing reasons and the reasons stated at the hearing on September 13, 2022, Defendant's motion to strike the declaration of Dr. Elise Kibler under Rule 12(f) (ECF No. 96) is **DENIED** without prejudice to re-urging in the form of appropriate objections at trial.

It is further ordered that Defendant's motion for summary judgment (ECF No. 93) is **GRANTED IN PART** as to Plaintiff's hostile work environment claim and **DENIED IN PART** in all other respects. Plaintiff's claims against PICCS for disparate treatment and retaliation under 42 U.S.C. § 1981 will proceed to trial.

It is so **ORDERED**.

**SIGNED** this 23rd day of September, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE